STATE, RESPONDENT, *v.* GAY, APPELLANT.

[Submitted March 9, 1896. Decided March 23, 1896.]

CRIMINAL LAW—*Homicide—Evidence.*—On a trial for murder, evidence that prior to the killing the defendant had had litigation or trouble about his land, which was offered for the purpose of showing the beginning of the trouble and the sentiment worked up against the defendant, was properly excluded until it might become relevant by connecting the deceased therewith; or until it was shown to relate to some circumstance that extenuated the killing.

SAME—*Evidence.*—On a trial for murder evidence offered by the defense that some person, not a witness in the case, had burned the defendant's house some days before the homicide, was properly excluded as irrelevant where it did not appear that the deceased had participated in the burning.

SAME—*Degrees of offence—Instruction as to penalties.*—Where the jury were instructed upon the distinguishing features of the several degrees of murder and manslaughter as defined by the statute, and as to the penalty for murder in the first degree, the omission of the court to also inform the jury as to the penalties for murder in the second degree and manslaughter was not prejudicial to the defendant, where no instruction defining such penalties was requested by the defendant and the jury found him guilty of murder in the first degree. (*State* v. *Baker,* 13 Mont. 160, cited.)

SAME—*Instruction as to dying declarations.*—The jury being the sole judges of the weight to be given to the testimony, an instruction offered by the defense that dying declarations should be received with great caution, was properly refused as commenting on

the weight to be given to that particular portion of the testimony. (*State* v. *Gleim*, 17 Mont. 17; *Wastl* v. *Montana Union Ry. Co.*, 17 Mont. 213, cited.)

SAME—*Instructions.*—The court not being required by section 2070 of the Penal Code, to give an instruction in any modified form, a party offering an erroneous instruction cannot complain that it was not corrected and then given.

SAME—*Dying declarations—Evidence.*—Statements by the deceased just after being shot, and while rational, that he knew his wound was fatal; that he could not recover; that he would never see his home again and that the defendant had shot him, are admissible as dying declarations, it appearing that he expressed no belief in his recovery at any time, and that a doctor had told him that all he could do was to alleviate the pain. (*State* v. *Russell*, 13 Mont. 164, cited.)

SAME—*Murder—Evidence to sustain conviction.*—Evidence that the defendant had aided another to escape from arrest and had left in his company threatening to kill any one who attempted to arrest him; that prior to the homicide both had resisted the officers on several occasions; that while being pursued his companion killed an officer, whose official character was well known to both, and whom defendant had himself threatened to kill, although the officer after exchanging some shots with him had commanded them to surrender and said he would shoot no more; that defendant shot another officer immediately upon the latter discovering him in hiding; that the deceased in his dying declaration said that defendant had shot him; that defendant after shooting the deceased shot at another officer; that defendant was at no time fired upon until he had first drawn his gun or was fleeing to elude them,—is sufficient to sustain a conviction of murder in the first degree.

SAME—*Arrest—Resistance to officers.*—Where one who had committed a felony and had shown a disposition not to submit to arrest aimed a rifle at an officer, whom he well knew officially, and prepared to shoot him when commanded to stop and throw up his hands, it was not necessary to justify the attempted arrest that the officer should have first disclosed his official character and the reason for the arrest.

SAME—*Remarks of counsel in argument—Appeal.*—The appellate court will not review remarks made by the prosecuting attorney in argument to the jury, and claimed to have been prejudicial to the defendant, where no objections were made at the time and the court was not requested to instruct the jury to disregard them. (*State* v. *Biggerstaff*, 17 Mont. 510, cited.)

NEW TRIAL—*Misconduct of jurors.*—Affidavits of jurors are competent to rebut affidavits charging misconduct on their part, made in support of a new trial, and where the misconduct was alleged to consist in the discussion, within the jury room, of an incestuous contract, said to have been made by the defendant, and in separating among spectators in the court-room during recess where the contract and the merits of the case were being discussed, the motion was properly denied where the affidavits of the jurors showed that the contract was not spoken of until after the verdict had been agreed to and which was based solely upon the evidence and instructions, and the bailiffs made affidavit that no one conversed with the jurors during recess. (*Territory* v. *Burgess*, 8 Mont. 58; *State* v. *Jackson*, 9 Mont. 508; *State* v. *Anderson*, 14 Mont. 541, cited.)

SAME—*Newly discovered evidence.*—A new trial upon the ground of newly discovered evidence, based upon the affidavit of a member of the sheriff's posse that they were instructed to take no chances and to kill the defendant on sight, is properly denied, where the officer by counter affidavit, as well as the sheriff, stated that the instructions were not to shoot unless absolutely necessary.

SAME—*Same—Diligence.*—A new trial upon the ground of newly discovered evidence is properly denied where the uncontradicted affidavit of the prosecuting attorney completely rebuts the affidavits in support of the motion, by showing that all the newly discovered evidence could have been easily procured on the trial.

CONSTITUTIONAL LAW—*Ex post facto law—Changing rules of evidence.*—The Code of Civil Procedure of 1895 (§ 3265) making a malicious and guilty intent a conclusive presumption from the deliberate commission of an unlawful act for the purpose of injuring another, is not *ex post facto* as to a homicide committed prior to its adoption, in that it changes the rules of evidence and declares a force to evidence greater than that existing under the former statute (§ 19, Fourth Division of the Compiled Stat-

utes) defining express malice to be "that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof," since express malice is composed of the same elements of fact in each statute, all of which must be proved by competent evidence beyond a reasonable doubt, and each of which is rebuttable.

*Appeal from First Judicial District, Lewis and Clarke County.*

CONVICTION for murder in the first degree.  The defendant was tried before BLAKE, J.  Affirmed.

*Lewis Penwell, W. F. Sanders* and *J. M. Clements,* for Appellant.

*R. R. Purcell, Henri J. Haskell,* Attorney General, and *Ella K. Haskell,* for the state, Respondent.

I.  Where a party moves for a new trial on the ground of misconduct on the part of the jury, which took place during the trial, he must aver in his motion, and show affirmatively that he and his counsel were ignorant, until after the jury had retired, of the fact of such misconduct.  (Thompson & Merriam on Juries, § 428; *Territory* v. *Hart,* 7 Mont. 489; *Territory* v. *Burgess,* 8 Mont. 58; *Territory* v. *Clayton,* 8 Mont. 18; *State* v. *Jackson,* 9 Mont. 509; *State* v. *Floyd,* 63 N. W. (Minn.) 1096; *State* v. *Anderson,* 14 Mont. 541; *Bradshaw* v. *Degenhart,* 15 Mont. 267.)  The fact that opportunity may have been given for improper communications with a jury while passing in and out of a crowded court room or on the street, does not, in the absence of any showing that such communication was actually had, or that there was any misconduct, raise a presumption against a verdict.  (*King* v. *State,* 20 S. W. (Tenn.) 169.)  It affirmatively appears that in none of the separations of the jury complained of did they hold any improper communications with any persons, or overhear any conversation between them which would tend to influence their verdict against the defendant.  The separation of the jury, where it is shown that they were not approached, is not ground for a new trial.  (*State* v. *Church* (S. D.), 60 N. W. 143;

*State* v. *Murray*, 29 S. W. (Mo.) 700; Thompson & Merriam on Juries, § 439.)

II.    Evidence of defendant's threats not to be taken alive and to kill any one who came after him, was competent as explaining why the officers proceeded to make the arrest in the manner in which they did, and as showing that their actions were justified by the defendant's threats.    The evidence is also competent to show that defendant expected there would be an attempt made to arrest him, and having made these threats that he would kill any one who attempted to arrest him, he could not claim that he apprehended any unnecessary violence from the officers, because of the precautions they took and of their being armed and prepared to defend themselves, because he must have expected, in view of the threats made by him, that the officers, in attempting to arrest him, would arm themselves and be prepared to defend themselves by shooting, if necessary.    (*Miller* v. *State* (Tex.), 20 S. W. 1103; *People* v. *Brown*, 59 Cal. 353; *Rudolph* v. *People*, 45 N. Y. 215; *People* v. *Carlton*, 115 N. Y. 633; *Rowan* v. *Sawin*, 5 Cush. 284.)

III.    It does not appear from the record that any exception or objection to the statements of the attorneys for the prosecution was made by counsel for defendant during their remarks to the jury.    (*State* v. *Hawkins*, 18 Ore. 480; *Sears* v. *Seattle Street Ry. Co.*, 6 Wash. 233; *State* v. *Reagan*, 8 Wash. 511.)    An exception to improper remarks of counsel in arguing to the jury will not be considered when no instruction as to how the jury shall consider such remarks is requested.    (*Columbia Railroad Co.* v. *Hawthorn*, 3 Wash. Ter. 354; *Sears* v. *Seattle Street Ry. Co.*, *supra*; *State* v. *Biggerstaff*, 17 Mont. 510; *West* v. *Brown*, 35 Pac. 921; *Farmer* v. *State*, 91 Ga. 720; *State* v. *Howard*, 24 S. W. 41; *North Chicago Street Ry. Co.* v. *Cotton*, 140 Ill. 186 ; Thompson on Trials, Vol. 1, § 957; *State* v. *Mack* (La.), 14 So. 141; *Stone* v. *State*, 17 So. 114; *Territory* v. *Collins*, 6 Dak. 234; *Learned* v. *Hall*, 133 Mass. 417; *Miller* v. *State* (Tex.), 25 S. W. 634; *State* v. *Sorton* 34 Pac. 1036.)

IV.    The contention of counsel that the court erred in instructing the jury as to the punishment for murder in the first degree, and not instructing them as to the punishment for manslaughter is answered by the fact that defendant did not request of the court an instruction as to what the punishment for murder in the second degree is, or as to what the punishment for manslaughter is.    (§ 1080, Code of Civil Procedure ) It is not error for the court to omit to charge the jury upon a particular point unless asked to do so at the trial.    (*Territory v. Rowund*, 8 Mont. 118; *People* v. *Haun*, 44 Cal. 100; *People* v. *Ah Wee*, 48 Cal. 239; *People* v. *Geiger*, 49 Cal. 649; *People* v. *Gray*, 66 Cal. 276; *People* v. *Flynn*, 73 Cal. 516; *People* v. *Oleson*, 80 Cal. 128; *People* v. *McLean*, 84 Cal. 482; *Territory* v. *McAndrews*, 3 Mont. 164.)    Failure of the court to charge the jury on any given question of law is not error unless a request for the charge was made by counsel. (*State* v. *Brooks*, 5 S. W. 257 (Mo.) ; *Powers* v. *State*, 87 Ind. 144; *Rauck* v. *State*, 11 N. E. 450; *State* v. *Paxton* (Mo.), 29 S. W. 705; *Blunt* v. *Florida*, 11 So. 547; *Felton* v. *State*, 39 N. E. (Ind.) 228; *People* v. *Marks*, 13 Pac. (Cal.) 149; *State* v. *Anderson* (S. Car.), 2 S. E. 699; *Leeper* v. *State*, 40 N. E. (Ind.) 1113.)    Defendant's instruction as to dying declarations was properly refused as it was argumentative in its nature, and not applicable to the facts of this case and instructed the jury on the weight of evidence.    (*State* v. *Sullivan*, 9 Mont. 174; *State* v. *Gleim*, 17 Mont. 17; *State* v. *Pearce* (Minn.), 57 N. W. 652; *Wastl* v. *Montana Union Ry. Co.*, 17 Mont. 213; *Knowles* v. *Nixon*, 17 Mont. 473.)

V.    The appellate court will not grant a new trial on the ground that the verdict is contrary to the evidence if the testimony is conflicting, and there is any evidence to support the verdict.    (*People* v. *Brown*, 27 Cal. 500; *People* v. *Strange*, 61 Cal. 496; *People* v. *Darr*, 61 Cal. 554; *People* v. *Vance*, 21 Cal. 400.)

VI.    The circumstances under which Macke was killed clearly show that the defendant is guilty of murder in the first degree.    It appears therefrom that defendant and Gross had de-

termined not to be arrested and that they knew that a posse was after them to arrest them for felony. At the time Macke was shot no effort was being made to take defendant into custody for the reason that the officers did not know where defendant and Gross were. (*People* v. *Pool,* 27 Cal. 572; *Genglish* v. *State,* 30 S. W. (Tex.) 233; *Thompson* v. *State,* 18 S. E. 305; *Wilson* v. *State,* 141 N. Y. 185; Kerr on Homicides, § 189, 198; 1 Wharton on Criminal Law, § 414-419-434-443.) At the time Macke was shot the question of warrant or no. warrant was not considered by defendant and Gross. They did not know but every member of the posse had a warrant in his pocket. None of the officers or members had an opportunity to exhibit a warrant to defendant Gay for the reason that they shot at the officers whenever they thought an attempt to arrest them was about to be made.

VII. Newly discovered evidence, merely cumulative or impeaching, is no cause for granting a new trial. (*Sweet* v. *State* (Ga.), 17 S. E. 273; *Penn. Co.* v. *Nations,* 12 N. E. 309; *Lee* v. *Berlinham,* 18 Pac. (Kan.) 218.) Affidavit for new trial on ground of newly discovered evidence must contain facts showing diligence. (2 Thompson on Trials, § 277.) Appellant's ability or inability to have obtained it before trial is a question of fact for the court to determine from proof submitted in support of motion. (2 Thompson on Trials, § 2767; *People* v. *Sutton,* (Cal.), 15 Pac. 86; *Martin* v. *Price* (Ind.), 40 N. E. 33.) A general statement that all possible diligence was used is not sufficient. (*Peterson* v. *Collier,* 3 S. E. 119; *Weeks* v. *State,* 3 S. E. 323.) The defendant must show that the testimony came to his knowledge subsequent to the trial, that it was not due to want of diligence that it was not discovered earlier, and that on new trial would probably produce a different result. ( *Wilson* v. *State* (Tex.), 21 S. W. 361.)

HUNT, J.—The defendant, William Gay, was charged with the crime of murder in the first degree. The information alleges that on the 12th of May, 1893, he deliberately and ma-

liciously killed James Macke, by shooting him with a rifle. The defendant was tried and convicted, and is now under sentence of death. He made a motion for a new trial, which was overruled. He appeals from the judgment of conviction and the sentence of death, and from the order overruling the motion for a new trial.

We will first notice the errors urged on argument, and relied upon in the appellant's brief :

1. The defendant testified in his own behalf. After briefly reciting the fact that he had resided at Castle for some time, defendant said that he had located a lot on some disputed ground at Castle, and built his house. He was then asked this question : "Subsequent to building your home and living there, you may just state generally, without particulars, whether or not you had any litigation or trouble about that land?" The state objected upon the ground of irrelevancy. Defendant's counsel stated that the object of the question was to show the beginning of the trouble, and the sentiment worked up against defendant, resulting in transactions in April and May, 1893. The court then said : "At this time I do not think it competent for this witness to testify upon that subject. So far as I know, the name of this man Benson has not appeared in any way. I remember the opening statement. If it is subsequently shown that this man Benson was behind these proceedings, then the witness may testify on that matter, but at the present time I do not think it would be competent to go into it. The objection is sustained."

We can perceive no error in the ruling of the court. The fact that the defendant had had litigation or trouble about his lot had no possible apparent relation to the killing of James Macke, or the events or facts immediately, or even remotely, connected therewith. The rule is that all facts that go either to sustain or impeach a hypothesis logically pertinent are admissible. "But no fact is relevant which does not make more or less probable such a hypothesis. Relevancy, therefore, involves two distinct inquiries, to be determined by logic, unless otherwise arbitrarily prescribed by jurisprudence : (1) Ought

the hypothesis proposed, if proved, to affect the issue? (2) Does the fact offered in evidence go to sustain this hypothesis?" (Wharton on Criminal Evidence, § 24.)

The offer of counsel did not make the evidence relevant at that time, unless it tended to prove that Macke was directly or indirectly connected with the "trouble," and the "sentiment worked up" against defendant, prior to the time he was killed (some months afterwards), or unless it related to some fact or circumstance that extenuated the killing of Macke. It did not tend to do either. Besides, the ruling of the court was, expressly, not a final one; and, in the reasonable exercise of its discretion in controlling the order of proof, the judge properly excluded the testimony until it might appear to be relevant. No offer was subsequently made to introduce any testimony concerning the suggested litigation or lot difficulty, nor was any testimony offered in any way referring to any particular affair of the kind.

2. One J. H. Kidd testified for defendant to the effect that one night, shortly after Rader was killed, in the early part of May, 1893, he was going towards Gay's house, in Castle, to give an alarm of fire, and at that time saw one George Creiger. The state objected to what Creiger said or did at the time, as immaterial and forming no part of the *res gestae*, said Creiger not being a witness. The defendant insisted that it was competent to show that Creiger burned Gay's house before Macke was killed. The court excluded this offered testimony as to Creiger, giving as a reason that Creiger was not a witness, and that the state had not brought anything he did before the jury. The testimony appeared to be entirely irrelevant to the killing of Macke, or to the conduct of defendant prior thereto. Suppose Creiger had maliciously burned defendant's house; unless it was shown Macke had had some participation in it, what possible explanation or justification could Creiger's offense constitute for the alleged wanton killing of Macke some days thereafter, and many miles away from the scene of the arson by Creiger? The testimony being wholly immaterial, there was no error in sustaining the objection.

3.   The court instructed the jury generally upon the several degrees of murder, and their distinguishing features, and manslaughter, as defined by the statutes, and told the jury that under the information, if they were so satisfied under the instructions and by the evidence, beyond a reasonable doubt, the defendant might be convicted of murder in the first degree, murder in the second degree, or manslaughter.

The statute (Penal Code, § 353) fixing death as the penalty for murder in the first degree was given, but so much thereof as fixed the penalty for murder in the second degree was not; nor was the section (§ 356) fixing the punishment of manslaughter included in the charge   The omission of the court to give the penalties for murder in the second degree and manslaughter is assigned as error.   The point is not well taken. If the jury had, for example, been instructed what the penalty for manslaughter was, but had not been instructed what the penalty for murder in the first degree was, yet had convicted of murder in the first degree, then the appellant's position would be somewhat different; for it could be argued in such a case that, if the jury had known that death was the penalty of murder in the first degree, they might not have agreed upon that degree of murder, because of the severity of the penalty. But here the proposition is different.   The jury in this case, with full knowledge of the worst consequences to the defendant, and with ample definitions of the constituent elements and distinctions of the various degrees of homicide and manslaughter, have found that the evidence warranted the conclusion that the defendant is guilty of that crime which demands the forfeiture of his life to the state.   Therefore, if, notwithstanding their knowledge of the severity of the penalty, they have found that the evidence proves that the defendant is guilty of willful, deliberate and premeditated murder, how could a knowledge on the part of the jury that for any other degree of killing, or for manslaughter, a lesser penalty would be inflicted, have benefited the defendant?   The answer does not lie in the argument that they really may have found him guilty of murder in the second degree, but, in ignorance,

thought the penalty for murder in the second degree or man-
slaughter was death, because, in addition to all statutory defi-
nitions of homicide generally, they were expressly told that
the distinguishing feature between murder in the first degree
and murder in the second degree rests in the absence of de-
liberation, premeditation and preconcerted design to kill in
murder of the second degree, while upon manslaughter they
were charged that the killing is without malice, and voluntary
or involuntary. Again, the statute wisely, and to pin a jury
down to the most specific finding in murder cases, requires
them to designate in the verdict the degree of murder of which
they may convict. Thus, the jury must announce whether
they have found from the evidence that deliberation and pre-
meditation indispensable to warrant the conclusion that the
crime proved by the evidence is murder in the first degree, be-
yond a reasonable doubt. With these statutory and other in-
structions, clearly explaining what murder in its degrees was,
what manslaughter was, what excusable and justifiable homi-
cide was; with malice, express and implied, defined; with plain
direction that they must designate what degree of murder they
found defendant guilty of, if they convicted at all; and with a
clear knowledge that murder in the first degree was punish-
able by death,—they have deliberately applied the law to the
evidence, and found the defendant guilty of murder, and have
designated that he is guilty of murder in the first degree. By
no fair reasoning can we see how the jury could have been
mislead in their deliberations, or how the defendant could have
been prejudiced in his rights, by the omission to tell the jury
what the penalties for the lesser crimes were. (*Morton* v. *State*
(Tenn.), 19 S. W. 225.)

Our attention is called to subdivisions 8, 9, § 1080, Code of
Civil Procedure, 1895, which read as follows : " (8) When
the argument is concluded the court shall charge the jury in
writing, giving in connection therewith, such instructions as
are offered or allowed. * * * (9) In charging the jury,
the court shall give to them all matters of law which it thinks
necessary for their information in rendering a verdict."

No instructions defining the penalties for murder in the second degree, or manslaughter, were asked by the defendant; and as said, the court did give the jury the law of murder and manslaughter as defined by the statutes, and necessary for their information.    The rule laid down in the case of *State* v. *Baker*, 13 Mont. 160, was therefore complied with, and the defendant cannot complain.    Most of the cases cited to us by the appellant upon this point are where the court omitted entirely to charge upon the crimes of murder in the second degree and manslaughter, or to define the elements of such crimes at all.    They are therefore not applicable.

4.    Error is assigned because the court refused to give the following instruction offered by the defendant :    "The jury are instructed that the dying declarations of Macke are to be received with great caution, for the reason that the accused has not the power of cross-examination, —the power quite as essential to the eliciting of all truth as the obligation of an oath  can be,—and that where the witness has not a  deep and strong sense of accountability to his Maker, and an enlightened  conscience,  the passion of anger and feelings of revenge may, as they have not unfrequently been found to do, affect the truth and accuracy of his statements; especially as, too, the salutary and restraining fear of punishment for perjury is, in  such cases, withdrawn.    And it is further to be considered that the particulars of the violence of which the deceased has spoken were, in general, likely to have occurred under circumstances of confusion and surprise, calculated to prevent their being accurately observed, and leading both to mistakes as to the identity of persons, and to the omissions of facts essentially important to the completeness and truth of the narrative."

The instruction offered is taken from 1 Greenleaf on Evidence, § 162.

The court refused to so charge, "but offered to embody in an instruction the whole of said section 162."    This offer was declined.    We have no statute authorizing such an instruction as offered upon the weight to be attached to dying declarations.    It would have been error to have simply told the jury

that such declarations were to be received with *great* caution, etc., as asked.    " The jury being the sole judges of the weight to be given to the testimony, the court should not tell them what particular weight to give to any portion thereof.    (*State* v. *Gleim,* 17 Mont. 17; *Wastl* v. *Montana Union Ry. Co.,* 17 Mont. 213.)

Moreover, the instruction did not correctly, argumentatively state the law generally, or as laid down by the author from whose text it was copied.    Greenleaf expressly writes as follows in the identical paragraph from which defendant chose the instruction :    "Though these declarations, when deliberately made, under a solemn and religious sense of impending dissolution, and concerning circumstances in respect of which the deceased was not likely to have been mistaken, are entitled to *great* weight, if precisely identified, yet it is always to be recollected that the accused has not the power of cross-examination," etc. (as offered by the defendant).    The appellant says, however, that if the instruction, as offered, was not in conformity with the judge's view of the law, he should have so modified it as to cover the subject of dying declarations, so as to advise the jury that such evidence was not to be received with the same weight as other testimony.

The statute authorized the court to positively refuse the instruction, and did not make it obligatory to give it in any modified form.    (Penal Code, § 2070.)    A party may not offer an erroneous instruction upon the weight of testimony, and then complain that it was refused, or not corrected and then given.

5.    It is also contended that the dying statements of Macke were inadmissible.    Just after he was shot, Macke said he was "shot through the guts."    "I wish it was through the heart. Then it would be quicker. It would kill me."    When he was offered water to relieve his great suffering, and told that his wound would not be fatal, he said he knew better; that it would be; that he couldn't recover.    Later, Macke said "Bill Gay" shot him.    He also said to McGrail, when told that he would be taken to Castle when he got better, that he would

never see the springs or home again; and thereafter on the day of his death, he again said Gay had shot him. At all these times Macke was rational. The doctor had previously told him that all he could do for him was to try and alleviate his pain, which was intense from the time of the shooting up to death.

The witness for the state further said that nothing said seemed to encourage him; that when he was put into a wagon, to be taken to a house, some one asked him if he wanted his gun, to which he replied, "I will have no more use for it;" and that he made no expressions of a belief in his recovery at any time, and spoke and acted as if aware of his danger.

We need no authority for the admissions of statements made under such circumstances besides that of *State* v. *Russell*, 13 Mont. 164, where the law is reviewed and thus commented upon : "These authorities all hold that if all the facts and circumstances surrounding the declarant at the time of making the declarations show them to have been made under the sense of impending death, notwithstanding the declarant may not have said he was without hope of recovery, or was dying or going to die, then such declarations are admissible in evidence. The facts and circumstances surrounding the declarant in this case at the time of the making of the declaration warrant the conclusion that they were made under a sense of impending death, and, we think, were properly admitted to the jury."

6. Coming now to the proposition, earnestly asserted by the defendant's counsel, that the verdict is contrary to the evidence, and to the contention that the conduct of the officers and other members of the posse was illegal, and that the acts of Gay and Gross, even if they did kill Macke, did not constitute murder, we must briefly state the more material parts of the evidence :

It appears by the testimony offered in behalf of the state that in 1893 the defendant, Gay, and one Harry Gross, a brother-in-law and an associate of the defendant, were living in and about Castle, Meagher county. Gay was a married man, and lived with his family in the town of Castle. Gross

lived upon a ranch generally called the "Gross Ranch," about six miles below Castle.

About April 1st, a search warrant was put into the hands of an officer to search Mrs. Gross' house. On April 2d, Gay asked the constable when he was going to send a gun back to Mrs. Gross. The gun belonged to Mrs. Gross, and the constable promised to return it. Gay told the officer that if he, the officer, did not return the gun it would be bad for him.

On the 4th of April a warrant was sworn out against Gross for having resisted an officer while serving a search warrant. Gross was arrested, and taken before the justice, and bound over under the charge of having resisted Westbrook, a constable, in serving a search warrant issued out of the justice's court for Castle township. Gross wanted bail, and the under-sheriff, Lewis, went with him while he endeavored to procure such bail. They met the defendant, Gay, that day. Gay was trying to get bail for Gross. That night the officer and his prisoner, Gross, went to Gay's house, to see if Gay had succeeded in his efforts. Gay had not procured bail, and said he would go down to Brockett's ranch, some miles away from Castle, and try and procure bail there. After stating that his horse was ready, Gay went out as if to go to the stable. Gross followed him, and the officer found the two outside of the house talking together. Ten or fifteen minutes thereafter, Gross went out through the kitchen. The officer followed him almost immediately, but he had escaped.

On the 24th of April, Peter Westbrook, a constable of Castle township, went to Gay's house in Castle, to arrest Gay, by the instructions of the sheriff, for stealing a lot of goods in Wyoming. It was about 9 o'clock in the evening when the constable went there with a man named Greiger. He heard a noise upstairs in Gay's house, and started to go up, but was told by the women that he could not go through the house. He did go up, but found no one there. Greiger and the constable, believing Gay had gone out the rear of the house from an upstairs door, then left Gay's house, and went in search of him through some timber near by, when

suddenly Gay rose up from behind a stump 35 or 45 feet distant, and fired at them, and then ordered them to get out, or he would kill them, and fired again.

In the latter part of April,—about the 28th,—Lewis, the undersheriff of Meagher county, the officer who had arrested Gross, and from whom Gross had escaped, in company with a man named Sarter, who was a constable, and one Dennis Mc-Grail, a special deputy sheriff, went down to Gross' ranch, to arrest Gross and Gay. When a mile away from the ranch they saw them apparently working about a hay wagon that was stuck in the mud. The posse kept out of sight of the men as best they could, and hid themselves about 150 yards back of Gross' house. The evidence tends to prove that the officers were seen, however. Gross and Gay finally extricated the hay wagon, drove to the barn, unloaded the hay, changed their wagon bed, and started down the creek. When they passed a point about 200 yards away from the posse in hiding, Lewis and one of his posse rose up, and hollowed to them to stop, and to throw up their hands. The team was stopped by Gross, who was driving, whereupon Gay picked up a rifle in the wagon, jumped out of the wagon, ran around to the further side, rested the gun on the wheel, and pointed it directly at the posse. Upon seeing this, Lewis raised his gun and shot. Gay fired within an instant thereafter. Gay fired again. Then the team ran away. The officers returned the shots. Gay then moved to the other side of the creek, and again fired, but nobody was hit. The posse returned without further effort to arrest the men that day.

At the time that this posse went down to Gross' ranch, the object of arresting Gay was for helping Gross to escape from the officer, and the reason given by the undersheriff for taking the two men with him was that he had been told that Gay and Gross had said they would never be taken alive; that they would kill any one that came after them. At that time Mc-Grail who was sworn in as a deputy sheriff, had a warrant for the arrest of both Gay and Gross for stealing some goods in Wyoming and bringing them into Meagher county. It had

been placed in his hands on April 26th, by the undersheriff, Lewis.

On the 8th of May, C. E. Westbrook saw Gay and Gross some six or seven miles south of Castle. They were on horseback, and at first moved away from Westbrook, but he subsequently met them two miles further away, at the Durst ranch. Each had a rifle; Gay's being a 45-120 Sharp's rifle, known as a "buffalo gun." Gay asked Westbrook if he was looking for them, and upon being told, "No, not particularly," he replied, "Well, you don't want to be, nor any other ——." Westbrook told Gay that he was not looking for them. To this Gay said that there were a lot of parties looking for them, and he thought the witness was one of them. The three men talked for over an hour, and in this conversation Gay said that he understood that Bill Rader was out after him. Westbrook assured him that Rader was not, because he and Rader had been on a jury at White Sulphur Springs just before. To this Gay said that he was not afraid of Bill Rader any more than he was of any one else, but that, if he came out there after him, he would hurt him, or would kill him. Continuing, Gay said : "I always looked upon him [Rader] as a friend of mine, and I don't want him to come monkeying with my business. * * * I want you to tell him where you seen me. Tell them, if they want me, to come here after me." Gay also said that they had been trying to arrest him, and he had not done anything to be arrested for; and that, if they came out there, and wanted to arrest them, he would kill them,—any one that came. On cross-examination, this witness said that Gay stated that people had been hounding him, and that he had not stolen anything from anybody in Castle, or done any one there an injury, and that he would defend himself, and would not be arrested, and that there were not men enough in Meagher county that had sand enough to arrest him. Upon the day of this conversation with Gay, Westbrook told Fred Lewis, the undersheriff, in detail, what he had seen and heard.

On the 8th of May a posse started to arrest Gay and Gross.

When they were near Gross' ranch, they saw two men riding away on horseback, apparently armed. The posse, which consisted of seven men, then divided. Lewis, Rader, Brown and Westbrook went around to head the men off. The others were to keep behind them, and thus the men would be surrounded. The four who were together in turn separated again, Rader and Westbrook going together. They ran on to Gay and Gross after riding five or six miles. They came up a little ridge, leading their horses, and saw Gay and Gross below them, near a pile of poles,—one at the end of the pile, and the other ten feet away. The officers hollowed to them to surrender, and throw up their hands. At that time they were about 160 steps from Gay and Gross, with no obstructions between them. Gay was ten or twelve feet from the poles, walking over to the pile, and looking at the officers. The officers again hollowed. Gross then prepared to shoot, and the officers shot. Gay fell, as if shot, behind the pile of poles. Three or four more shots were exchanged. Rader then walked down the ridge, and hollowed out loud to them, saying : ''Gross, you and Bill Gay come out and surrender. We have quit shooting. Come out and surrender to us, and we won't fire any more at all.'' No answer came from Gay or Gross. Rader then changed his position, so as to get the men between himself and Westbrook. To do this he went on top of the ridge considerably higher than he had been. He went slowly, and not directly, and took about 20 minutes to reach the top, which was about 500 yards off. No shots were being fired at that time. When Rader reached the top, Westbrook saw a man, whom he recognized to be Gross, step out from behind some trees about 50 feet away from and back of Rader, and shoot. Rader threw his gun out of his hands, and hollowed that he was shot. Immediately thereafter the man from the pile of poles below fired at Westbrook. When Rader was shot, Westbrook had Rader's horse, his own having broken loose from him. Westbrook then went to inform the rest of the posse of the fight, leaving his own horse, and riding Rader's. The posse returned to the point where Rader was killed. They

were on horseback, and were riding up to a high point on the ridge, when they saw a dog lying by the trees and a man behind the trees.    An effort was made to surround the two men, but when they got to the top of the hill, having gone by an indirect way, they saw them jump on their horses and ride away, having an extra horse with them, the extra horse being the same animal that Westbrook had lost some hours before, at the time when Rader was killed.    The posse then gave up the search at that time.

In the next day or so the sheriff and a posse of seven started towards the Musselshell river, believing that Gay and Gross had gone down there.    They left Castle about two days after Rader had been killed; that is, on May 11th.    On the morning of the 12th of May they reached the Musselshell, where the sheriff increased the number of his posse by summoning several men in addition to those he took with him.    They made a rendezvous at a place called "Winnecook," some 65 miles from where Rader had been killed.    About that place they divided.    Four or five went across the Musselshell river. Three men went down the river; the rest of the posse stayed with the horses.    There was a wire fence at the foot of a bluff, inside of which there was meadow land.    Brush and willows grew along the river.    A shepherd dog was tied in the brush and trees near the Musselshell river, to the right of the bend, some little distance away.    A man named Williams, who had been summoned by the sheriff at Martinsdale, and who was with the posse, had seen a man with three horses near a wire fence below a cut,bank in the field on the Musselshell.    After making this discovery, he informed the sheriff and his posse. The horses were identified as the three that Gay and Gross had had.    Thereafter Lewis, Macke and Williams, who joined them, started across the meadow, and were going up the river next to the edge of the growths of willows that there were on the east side of the Musselshell.    They were going towards the bend.    Their orders from the sheriff were distinctly not to shoot unless necessary to defend themselves.    Lewis was in the lead.    Twenty-five feet behind him was Williams, and 25

feet behind him was Macke. Macke was looking at Williams, each man holding his gun with both hands, but not looking for anybody in the brush. These three had proceeded this way to a point in the brush about 150 yards from the bend of the river, when they heard something. Williams looked back towards Macke, saw him "kinder wheel down, heard a report of a gun, and saw smoke right above the brush." The firing came out of the brush opposite Macke, and about 20 feet from him. Lewis says that he did not hear any shots fired in that vicinity before that time that day. Williams, who never had seen Gay to know him, saw a man under a clump of willows, with a gun in his hands, lying on his stomach, and resting on his elbows, with the gun pointed right at where Macke stood.

Williams' description of the face of the man who pointed the gun in the direction where Macke fell disagrees entirely with the description of the man Gross. Gross is described as a tall man with light hair, light complexion and gray eyes. The man that Williams saw had a dark beard and very sharp eyes; such eyes as Gay's. Williams snapped his gun at him, but the weapon being out of order, did not go off. The man who had shot Macke then got on his knees, loaded his gun, and aimed towards Williams, and fired, and Lewis then fired. Williams and Lewis moved away. Thereafter Lewis fired in the direction whence the shot had come that killed Macke. Macke was moved out some little distance from where he was shot.

Macke was shot near the center of the body, the ball entering about an inch above and two inches to the left of the navel, and ranging down and coming out above the hip bone close to the spine. He suffered intensely, and died two days thereafter, after repeatedly saying that the defendant Gay had shot him. Later that day some shots were fired in the brush where the men were secreted, but to no avail. They did not come out. The attempt to arrest was again given up. The day after Macke was shot, the posse went down to the scene of the killing. The dog and men had gone. They found a pit, freshly dug in the sand among the willows and very close to

where the man was lying when he shot Macke. It was probably four or five feet one way, running north and then to the west and then to the south. In the middle there was a place about two feet wide, in the shape of a barricade. Between the pit and the creek to the west there were thick willows. On the east side it was open mostly, except the tops of the willows. Two knives were found there.

A search was thereafter made by the sheriff for Gay and Gross, but they had gone. Gay was afterwards arrested, in December, 1894, at The Needles in California.

Macke in his statement always said that Gay shot him, and on one occasion he told the doctor that when he received the shot he was in a leaning position, and that he looked around, and saw Gay, and then turned around, facing Gay, and in a stooping position, looking, and when he was in that stooping position he received the shot.

The defendant himself testified that he had, while living in Castle in 1892, received various letters warning him to leave that vicinity or he would be killed. He denied that he ever told the constable that unless Mrs. Gross' six-shooter was returned to her trouble would come to the constable. He denied that he had ever aided Gross to escape, but said that the arrangement between Gross and himself at that time was that he (Gay) should go to arrange and try to procure bail for Gross, and that there was no concert of action between him and Gross in Gross' eluding the officers; that upon the night of the 24th of April he saw two men about his house, one of whom stepped behind a pine bush; that he heard a man at the front of his door say that he had come to arrest Gay, and was going to have him or kill everybody in the house; that immediately thereafter he stepped out of his house taking a Sharp's rifle with him; that when he got about 75 feet from the house he saw some one behind a big stump, and that that person fired at him; that immediately thereafter men followed him; and that he hid behind a stump himself; and very soon after he went up a ridge near his house, crossed over it and went down by a ranch, and over to Gross' ranch; that on the 27th of April, when the

shooting occurred on Gross' ranch, while he and Gross were driving down the creek after unloading a hay wagon and when they had passed Gross' house, about 300 yards, and without knowing that anybody was in the vicinity of the house, about 250 or 300 yards from the house, they stopped; he heard a shot on his left, and several more shots were fired immediately; that he then jumped out of the wagon, grasped the gun, and started towards the creek, about 75 yards distant; that he saw two men bareheaded in the sage brush, with their guns pointed at them and shooting; that one bullet went through the wagon box; that he did not recognize any of the men; that he did not rest his gun on the hind wheel of the wagon; that while he and Gross were running away, and about that time, several shots were fired; that he then crossed over the creek, and went onto a bench on the other side, and that very soon thereafter he and Gross saddled their horses, and went out to the hills and remained over night, because they were afraid of their lives. The defendant said he never heard any command to throw up his hands.

The description of the fight where Rader was killed as given by the defendant was that he and Gross were going over to Brocket's ranch to return a gun Gross had borrowed; that he was taken sick on the way, and sat down near some poles or logs on Woodson creek; that they were not traveling in a public highway, but were making a straight line across the prairie, regardless of the roads, without suspecting that any one was following; that he laid down near the logs, and went to sleep; that he had been sleeping probably an hour, when Gross hollowed that some men were after them; that at that time two shots were fired; he grasped his gun, and then saw two men on the ridge; that he heard nobody say anything, and that he and Gross ran to the creek; that in the excitement he went back to the pile of poles for his belt of cartridges, and as he turned around was shot in the knee, whereupon some one hollowed : "I have got you, you s— o— b—;" that the shot came from where the men were; that he did not recognize either of the men; that he and Gross then made towards the point of the

ridge that came down to the creek, Gross in the lead; that they saw the two men making a detour to get around the ridge, and that when they arrived at the point where the ridge projects into the creek, two men were coming down the ridge. He further said that he could see Gross ahead of him on the side of the hill, and that about the time he, the defendant, got opposite the ridge, two shots were fired; that he looked around, and saw two men about 150 yards from the creek where he stood; that Gross fired one of the shots, and the other was fired by one of the two men; that one of the men dropped his gun and ran, and the other man followed and hollowed and both ran up the ridge; that he did no shooting himself at that time and no more was done; that he and Gross followed up the ridge and found two guns near where they had seen the man drop his gun; that Gross took one gun, and that defendant and Gross were walking, leading their horses, down the hill, when five men appeared; that one of the mounted men fired at him, whereupon defendant and Gross started for the Freeman ranch on the Bozeman fork of the Musselshell.

The defendant says that he had an interview with Ed West-brook about the 8th of May, in which interview he told West-brook that he was tired of being shot at every time a posse was out after him, and that he asked Westbrook if he had heard that Rader was out after him. Westbrook replied by saying, "No," whereupon defendant said : "Well, Mr. Rader and me has always been good friends, which was true, and you tell Mr. Rader, that if he wants me, and brings a warrant, and comes out to me like a man, and will guarantee me protection, I will go with him. I have got tired of being shot at every time anybody comes around in sight of me;" that he told Westbrook that he had not done anything to be arrested for; that he had been threatened; but that he did not tell West-brook that if he saw Rader, or any one else, he would not be arrested or taken alive.

The defendant said that when they got down onto the Mus-selshell, having traveled by night, they went into a man's field, picketed their horses, and slept; that when they woke up

they saw a man up the creek on horseback; that at that time they had three horses, having found one on the flat after the shooting on Woodson creek; that they had a black dog with them; and, after traveling a little distance, they stopped on the right hand side of the road, under a high bluff, and tied their horses to a wire fence; that thereafter they went on the ridge to look out over their back trails, and saw what appeared to be a band of mounted men; that they at once went down to where their horses were, and that he and Gross got two butcher knives, and started down to the creek, crossing the creek twice; that they saw a man ride up to a man with some sheep and saw the man point towards where he and Gross were; that they followed down the creek in the thickest of the brush; that before they crossed the creek the second time he tied the dog; that they immediately commenced digging a rifle pit with the butcher knives, and while they were digging they heard some 20 shots fired towards where their horses were tied; that while they were in the pit, and had been there about an hour and a half, they saw a man come along on the side next to the prairie; that the defendant's position was next to the creek, and Gross was watching towards the prairie, their feet being together as they sat face to face in the pit. Defendant did not recognize the man, but Gross told him it was Undersheriff Lewis; that Gross was going to shoot him, but defendant begged him not to; that immediately Lewis started and ran; that thereafter he (defendant) was digging in the pit, and three or four minutes afterwards Gross jumped on his feet and fired; that he, defendant, saw the man fall; that at the time of the firing Gross had jumped out of the pit, but jumped back again; that several shots were then fired; that he saw several men pass up and down on the prairie thereafter, but could not tell who they were; that he did not see who the man was that Gross had shot at; that he did not see Williams on that occasion; that after the man was shot Gross raised his gun, and stuck it through the willows and fired; that about an hour afterwards there was a terrible fusilade up the creek, about 200 shots being fired, some of them being close to de-

fendant; that shots were fired off and on for half an hour be-
fore Gross had fired, and that the bullets whistled above the
willows.    On that night, the defendant said they moved away
traveling by night until they reached Castle.

On cross-examination the defendant testified substantially as
he did on the direct examination, but said that on the night
that Westbrook went to his house in Castle he knew that West-
brook was an officer,—a constable; that he generally carried a
gun, owing to the threatening letters he had received, although
it had been his custom all his life to carry a gun with him on
the prairie; that on the day of the shooting at Gross' ranch he
had his gun with him, thinking, possibly, he might run across
some game; that he knew the individuals who made up the
posse, but did not know the man that fired at them that day:
that he knew Rader well; that Rader was his friend; that he
did not know the men he saw were after him; that he did not
have time to converse with Rader; that he did not know the
man who was shot was Rader; that they got the third horse
where Rader was killed, finding him loose, with a saddle on;
that when they went to the brush on the Musselshell before
the fight they had gone three or four or five hundred yards
from their horses; that they did not want the dog along with
them, as the posse could see where they were that much
quicker; that the pit was not completed when Macke was shot;
that when the shot was fired he looked around, and saw the
second man, but before that he had been busy digging; that he
knew James Macke well, had known him for 12 or 15 years,
and that he was within 20 feet of him when he was shot, but
did not know who he was because he was falling when defend-
ant looked around; that after Macke was shot he asked Gross
not to shoot again unless he was forced to do it; that Gross'
hair and complexion were lighter in color than his; that he
had not sought the protection of the officers at White Sul-
phur Springs, when he was ordered to leave Castle, because
White Sulphur Springs was quite a long ways—35 miles—
from Castle, and everybody knew about his being threatened,
and no one seemed to give him any protection.    The rebuttal

testimony tended to prove an admission by Gay that upon the day of the fight at Gross' ranch they expected officers to be after them. A witness also swore that Gay and Gross told him when they were at the pit two men went along before Macke was shot and they saw them.

This evidence went to the jury to be weighed by them under the charge of the court in its various relations to the homicide. If they believed the dying statements of Macke, Gay shot him beyond all doubt, and shot him the instant that Macke turned and happened to see him in or by the pit in the brush. Accepting this fact as proven to the satisfaction of the jury, that Gay meant to kill him needs no demonstration beyond the fact that he was but 20 or 30 feet distant, and shot him in the body. That he was then bent on murder is evidenced by his lying in concealment within the brush, and killing the very first man who chanced to detect him and his hiding place. Again, his antecedent preparations, words, and conduct all prove that he had malice in his heart, and intended to kill any person whose errand was to take him into custody, and who advanced to do that errand. The shooting at the constable at Castle is one act to prove this. The escape of Gross, and the subsequent refusal of the two to yield to the officers' commands to throw up their hands, goes to prove it. The circumstance that they stopped their wagon, and that Gay simultaneously grabbed his rifle, and retired to the further side of the wagon, shows that they not only heard the command, but knew whence it came. The continued shooting at Lewis, whom Gay knew, and whose official capacity he knew, was further proof. So, too, was the firing at Rader, whom Gay had particularly threatened to kill if he came after him. So, too, was the act of hiding behind the poles, on Woodson creek, and the refusal to surrender to Rader when he advanced and ordered them to give themselves up. But more convincing than all other facts leading up to the time when Macke was killed were those of standing by and abetting the killing of Rader, the firing at the officers thereafter, and the flight to the Musselshell river. Having sent word to Rader that he would kill him, personally knowing

Rader well, and having refused to surrender after Rader had announced that he would shoot no more, the defendant's conduct and subsequent overt acts in the execution of the threats are solemn contradictions of the argument of appellant's counsel that there is nothing in the record but the passion or fear of the officers to excuse any one of them from taking a warrant of the state and "walking unarmed into the presence of Gay and Gross, stating to them the writ they had, the errand on which they had come, and the demand that they accompany them to the magistrate; nor is there anything in all this proof to render it probable that Gay would not have cheerfully submitted to an arrest so announced and conducted."

The officers had good reason to be very careful. The loss of two lives was a justification of their belief that the prior threats of Gay to kill those in pursuit of him were deliberate and were to be acted upon. And, throughout the whole evidence of the state, nowhere does it appear that Gay was fired upon until he first drew his gun and aimed towards the officials trying to arrest him, or was fleeing from them to elude arrest. On the contrary, the evidence is that he maliciously and persistently shot at nearly every man, if not every one, whom he knew or had reason to believe was in pursuit of him, *and whom he knew saw him.* The manner in which Macke was killed proves this. Macke was evidently the first one of the three who went by the pit on the day of the homicide on the Musselshell who saw Gay, and whom Gay knew saw him. Williams was the next man whose eyes met Gay's. He too was shot at but escaped unhurt.

But it is said the several attempts to arrest Gay were illegal, or if legal, were in an unlawfully threatening manner. Upon this subject the court charged, under the statutes, as follows :

"An arrest may be made in the following manner : (1) By a peace officer under a warrant; (2) by a peace officer without a warrant; (3) by a private person. When an officer arrests a person, in pursuance of a warrant directed to him, he shall state by what authority he makes the arrest; and, if requested

by the person arrested, shall show his warrant. An officer having authority to make arrests, shall arrest a person without a warrant : (1) When a person is attempting or has committed a public offense; (2) when a felony in fact has been committed, and he has reasonable grounds for believing the person arrested has committed the same; (3) where he has reasonable grounds to believe that a person has committed an offense, and that he may escape before he can be arrested by a warrant issued by some proper officer. * * *

"An officer acting without a warrant must first state his official character, and the reason for making the arrest, unless the person about to be arrested is in the actual commission of the offense, or when he is pursued, after an escape or flight. A private person, before making an arrest, shall state to the person about to be arrested the cause thereof, and require him to submit, except when such person is in actual commission of the offense, at the time thereof, or is in actual flight thereafter. If, after notice of intention to arrest a person by an officer, said person flee or forcibly resist, the officer may use all necessary means to effect the arrest.

"Every person required by an officer shall aid him in making an arrest. When the sheriff or other public officer authorized to execute process shall find or have reason to believe that resistance will be made to the execution of his process, he may command as many male inhabitants of his county as he may think proper to assist him in overcoming the resistance, and, if necessary, in seizing, arresting and confining those resisting."

When Gay and Gross were upon Gross' ranch, and the first posse of three went down there, there was no opportunity to read a warrant. Prior events had shown the disposition of the defendant not to submit, and, unless the two were caught without weapons, a fight was most probable. Nevertheless, to give them the opportunity to submit, and to avoid force, the officers ordered them to throw up their hands. Resistance with a rifle at once ensued. At that time no warrant was necessary. Gross had escaped, and there were reasonable

grounds to believe that Gay had aided Gross to resist, and to escape from the authorities at Castle, and in doing so had committed a felony.  This was enough, although it appears that McGrail, one of the posse, a deputy sheriff, had a warrant for the arrest of Gay and Gross for bringing stolen goods from Wyoming into Montana in his possession at the time of the shooting on Gross' ranch.  The right to arrest them both was therefore complete, under the warrant, by stating by what authority the officers acted; or it was complete, without the warrant, by the officials first stating their official characters, and the reason for making the arrest, unless the men were being pursued after an escape and flight.  But where, as in this case, an officer is officially well known to those whom he seeks to arrest, as was Lewis, undersheriff, and where, instead of submitting to a command by such officer to stop and hold up their hands, defendants at once aim a rifle at the officer, and deliberately prepare to shoot at him and his posse within easy recognition distance, their actions are equivalent to an intentional resistance of lawful authority, and the ceremony of disclosing the official characters of the officers and the reason for the arrest is voluntarily dispensed with by the defendants, and cannot reasonably be carried out; but the attempted arrest is by no means illegal.  (*People* y. *Carlton.* 115 N. Y. 623, 22 N. E. 257; *State* v. *Spaulding*, 34 Minn. 361, 25 N. W. 793.)

This case is readily distinguished from *Starr* v. *United States*, 153 U. S. 614, 14 Sup. Ct. 919.  There it was held that, if the defendant had no knowledge, was not informed, and was not chargeable with notice of the marshal's mission or official character, the fact that the defendant prevented the giving of notice had no such relation to defendant's claim of self defense and justification, founded on his ignorance and the appearance of the facts to him, as to justify the circuit court's charge. The charge was, in part, that if defendant had no notice of the marshal's official character, and the killing was apparently necessary to save his own life, then the killing was in self defense; but, if the defendant prevented the officer from giving

notice of his character or mission by threatening or violent conduct, then, of course, he would not be required to give notice. The facts of that case showed that, although the defendant was armed, he made no attempt to use his gun, and had it down, while the marshal deliberately put his to his shoulder and fired at defendant, and was thereafter killed.

The circumstances of the case at bar tend to show no legal justification for the defendant's acts, even upon the hypothesis that the officers were reprehensible for resorting to a needless command to the defendant and Gross to stop and throw up their hands. (*People* v. *Pool*, 27 Cal. 573; Kerr on Homicides, § 98.)

From the time of the attempt to arrest Gay and Gross at the Gross ranch, the defendants' attitude was that of men who had committed a felony and were escaping and fleeing. Both of them could have been arrested by law without any warrant at all, by an officer, or by a member of a posse acting under an officer's directions and authority. At the time that Macke was killed, the defendant, Gay, was liable for arrest for aiding Gross to escape, for shooting at the officers at Castle, for resisting arrest at Gross' ranch, for resisting arrest by Rader, for aiding and abetting the killing of Rader, for the stealing of Westbrook's horse, and for resisting the officer who pursued him after Rader was killed.

The evidence also tends to show that Gay knew that Lewis, the undersheriff, had gone by, just before Macke was killed. Gay, therefore, must have known that Lewis, as an officer, was looking for him and Gross. He must have known too, that Macke was one of the posse looking for him, for Macke was with Lewis. But, whether he knew that Macke was an officer or not, he had no lawful right to deliberately kill him, unless in necessary self defense. The theory of self defense was fully submitted by the instructions, and was argued to the jury; but it was rejected, and the evidence of premeditated murder credited.

We believe the verdict is in accordance with the evidence, and that it is just under the law.

8. Appellant asks us to decide that the remarks of County Attorney Gormley in the closing argument were prejudicial to his rights. The remarks were directed principally to some accusation once made against defendant of incest with his daughter, the county attorney saying that that matter had first been laid before the jury by defendant's counsel in his opening statement, and the state would have met the issue if it had been made. No objection was made to the remarks at the time of the argument, no request was made of the court to correct the county attorney, and no request was made to charge the jury to disregard the language used. The matter is therefore not before us. (*State* v. *Biggerstaff*, 17 Mont. 510.)

9. A new trial is asked on the ground of misconduct of the jury and newly discovered evidence. The principal affidavit to support the first of these grounds of motion was made by Benjamin Webster and is to the effect that Child, one of the jurors, said he had heard of an alleged contract in existence, "about Gay living in a state of incest with his daughter," and had heard of it before the trial.

By counter affidavit Child swears that his conversation with Webster was several days after the verdict was rendered; that he never saw any such contract as was referred to in Webster's affidavit, and never said he knew all or anything about the same; that his verdict was based entirely upon the evidence adduced on the trial.

Lewis Penwell, Esq., one of the defendant's attorneys, filed his affidavit to the effect that Dorrance, a juror, told him that, in the jury room, it was said Gay had been the father of a child by his daughter, and that he (Dorrance) was told by a juror that a contract of incest between Gay and his daughter was made between themselves; that Sass, another juror, had said such alleged contract was spoken of in the jury room. Penwell also swears that the jury, during brief recesses of the court, separated and scattered throughout the court room at times when the said contract and merits of the case were being freely discussed by spectators.

Dorrance, the juror, filed an affidavit that a juror told him

Gay's daughter had died from an abortion performed in order to deliver her of a child of which defendant was the father, and that a juror told him of the existence of such incestuous contract; but by later affidavit Dorrance stated that he believed, and is quite positive, that, if there was any conversation about the alleged contract of incest, it was after final vote had been taken on the guilt or innocence of the defendant, and that nothing was ever said or done in the jury room which in any manner influenced his decision, except the evidence.

The three bailiffs swear that, upon adjournment of court, at noon and upon each evening, the court admonished the jury as the statute requires, and that, in the five-minute recesses, they were always present, but no one ever spoke to any of the jurors about the case, nor did any of the jurors talk to anyone about it.

Sass, Henry, Hayes, Schotte, Thompson, McCrum, Evans, and Child, jurors, swear that, during the trial and deliberation, they never heard or talked of anything pertaining to the case except the evidence produced on the trial, and their verdict was rendered solely upon the evidence and a consideration of the instructions.   James and Dorrance, jurors, file affidavits to the same effect.   One juror, Hickey, corroborates the affidavits of the other jurors, Henry and others, but says he heard a bystander once say, during the trial, that, ''if the jury finds that man guilty, they ought to be —'' but he did not hear the rest; that, once again, he heard a remark to the effect that the defendant could not be convicted of any greater crime than manslaughter.   The affidavits of these jurors are competent. They rebut the affidavits of the defendant; and, the facts being as much within the knowledge of the jurors as of those who made the affidavits of misconduct, they were entitled to equal respect.   We find no error in the ruling of the lower court upon this point.   (*Territory* v. *Burgess,* 8 Mont. 58; *State* v. *Jackson,* 9 Mont. 508; *State* v. *Anderson,* 14 Mont. 541.)

The affidavits of newly discovered evidence pertained, principally, to an alleged statement, made by Macke, after he was shot, that he was feeling easy, and that, if he recovered, he

would never again meddle with other people's business; also, to the instructions of the sheriff to the posse on the Mussel-shell to the effect that the posse, of which Macke was one, were to take no chances at all in arresting Gay and Gross, but were to kill them on sight, that it was useless to try and take them alive, and "that it was generally understood, be-tween the deputies and the sheriff, that Gay and Gross would not be arrested, but would be killed as a result of the hunt;" also, to a statement by Gay, prior to the killing of Rader, that he would submit to arrest under a warrant, but would not be arrested by a mob without a warrant; also, that the alleged in-cestuous contract was a forgery.

By counter affidavits the sheriff denies positively that he ever told any person to shoot Gay or Gross on sight, but ordered all members of the posse not to shoot them if they could be taken without shooting, nor unless it was absolutely necessary in order to arrest them. A member of the posse, who had made affidavit used by defendant to the effect that the posse were not to take any chances, by counter affidavit ex-plains his first statement, and expressly says that they were instructed not to shoot unless absolutely necessary. The de-fendant made no affidavit himself, nor did Mr. Waterman, one of his counsel.

The uncontradicted affidavit of A. C. Gormley, county at-torney of Meagher county, completely rebuts the claim of rea-sonable diligence to produce all this testimony on the trial. He swears that one of the witnesses to newly discovered evi-dence, Cook, who was in the posse to arrest Gay and Gross, was serving a sentence for a misdemeanor, and was in jail with defendant, and conversed with him in 1895 before the trial; and that from December, 1894, defendant was in jail at White Sulphur Springs, charged with the killing of Macke; that Max Waterman, Esq., was his attorney from December, 1894, and was also the attorney of said Cook, and knew that Cook was one of the posse to arrest defendant; that another man, Petti-bone, who made affidavit, was frequently at White Sulphur Springs after defendant was put in jail, and could easily have

been procured as a witness; that the witness as to the alleged statements of Macke after he was shot is in business at Castle, and his name is on the indictment, and his presence could easily have been procured.

The showing of diligence being wholly insufficient, the court did not err in denying the motion upon the grounds alleged.

10. It is contended by the learned counsel for the appellant that the district court has injected into this case a federal question, and that it arises in this manner : The court told the jury that a presumption is a deduction which the law expressly directs to be made from particular facts, and that a presumption, unless declared by law to be conclusive, may be controvertible by other evidence, direct or indirect, but, unless so controverted, the jury are bound to find according to the presumption. The court then gave this charge : "The following presumption is deemed conclusive : A malicious and guilty intent from the deliberate commission of an unlawful act for the purpose of injuring another." The further charge was given that, among disputable presumptions, were these : That an unlawful act was done with an unlawful intent; that a person intends the ordinary consequences of his voluntary act.

It is argued that the charge, to the effect that a malicious and guilty intent, from the deliberate commission of an unlawful act for the purpose of injuring another, is a conclusive presumption, is an invasion of the exclusive right of the jury to judge of the facts in the case, and, furthermore, that this presumption declares a force to evidence greater and different than that existing at the time of the alleged murder of Macke inasmuch as it was only made a conclusive presumption by the Code of Civil Procedure, which was passed in 1895, and took effect subsequent to this homicide, and hence the statute is an *ex post facto* law.

The first inquiry before the court, therefore, is whether or not this statute has changed the rules of evidence as they existed prior to the adoption of the Code. If we take up the statute making malicious intent a conclusive presumption aris-

ing out of the evidence of the truth of the facts enumerated in the statute, we find that the words of the statute really resolve themselves into this : That if (1) the defendant killed Macke, and (2) if he deliberately killed him, and (3) if he deliberately killed him unlawfully, and (4) if he deliberately shot at him unlawfully, when he killed him, for the purpose of injuring him, then it is conclusive that, as a sequence of all these facts, he had a malicious and guilty intent. This is equivalent to saying that the deliberate and malicious commission of an unlawful act conclusively carries with it a malicious intent. The statute is axiomatic. A man cannot maliciously and purposely kill another without a malicious intent.

We must bear in mind that the statute makes a presumption a deduction from particular facts, and before this presumption of malicious intent can arise, all the facts from which alone it may arise must be proved by competent evidence, and beyond a reasonable doubt. Each element of fact included in the statute is rebuttable. Thus the defendant may deny that he committed the act at all; he may deny that the act was unlawful; he may deny that he deliberately committed it, or that he committed it for the purpose of injuring another. In his denials of these facts, doubtless, he may explain his motives and his purposes, his beliefs, and whether or not he reflected in his mind before he acted; and, if he should succeed in raising a reasonable doubt as to the existence of any of the four included elements, the jury could not be bound by a conclusive presumption that his intent was malicious. But if, on the other hand, he fails to raise any such doubt, and the state has satisfied the jury, beyond a reasonable doubt, by the evidence, that all of the four elements of fact did exist, then the law makes it binding upon them to deduce the conclusion that there was a malicious intent.

Now, by comparison with the law as it was before the Codes were adopted, the statute, when applied to homicide, is made up of the same elements which compose express malice as defined by section 19, div. 4, Criminal Laws, Compiled Statutes, which is as follows : "Section 19. Express malice is that

deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof."

Taking this definition of "express malice" as given in section 19, quoted above, we find that it, too, embraces these essentials : (1) There must be the intent to take away the life of a fellow creature. (2) The intent must exist to unlawfully take away that life. (3) The intent must be deliberate to unlawfully take away life. All these facts may be manifested by external circumstances capable of proof. Where they are so proven beyond a reasonable doubt, the law makes "malice." It might be illustrated in this way : A. is charged with the murder of B. He admits that he deliberately and unlawfully killed him (not justifiably, nor in necessary self defense), and that his purpose in firing the fatal shot was to injure him. From these admissions of fact, the law says the fact is regarded as proved, and there can be no evidence offered to rebut the presumption that there was a malicious intent in firing the shot. And such, we take it, was the rule of common law.

Mr. Justice Foster lays down, in his discourse on Homicide (261), that if an act unlawful in itself, but done deliberately and with intention of mischief or great bodily harm to particulars, or of mischief indiscriminately, fall it where it may, and death ensue, against or beside the original intention of the party, it will be murder. But if such mischievous intention does not appear, which is matter of fact, and to be collected from circumstances, and the act was done heedlessly and incautiously, it will be manslaughter,—not accidental death, because the act upon which the death ensued was unlawful. (*Rex* v. *Martin,* 3 Car. & P. 211; *State* v. *Smith,* 2 Strob. 77; *Com.* v. *York,* 9 Metc. (Mass.) 93; Rice on Criminal Evidence, page 30.)

We do not deem it necessary to note the other alleged errors, further than to say that none of them are well founded.

Upon the whole case, we think the defendant has had a per-

fectly legal and fair trial. We must therefore affirm the judgment and order overruling the motion for a new trial. Further proceedings must be had as provided by statute. (*State* v. *Biggerstaff*, 17 Mont. 510.)

*Affirmed.*

. PEMBERTON, C. J., and DE WITT, J., concur.

---

## ON REHEARING.

[April 8, 1896.]

PER CURIAM.—By a motion or petition signed by the defendant himself and certified to by his counsel as well founded in point of law, in their opinion, the court is asked to grant a rehearing, and to reconsider certain propositions decided. We have gone over the various matters enumerated in the petition which were presented for review by the record. They were each and all fully considered, and, for the most part, are specifically discussed in the opinion rendered. Those not so specifically discussed were considered as wholly unsound, and, moreover, were not presented to us in argument or brief. Since the opinion in this case was announced, there has been published a decision by the supreme court of Utah, in *People* v. *Coughlin*, 44 Pac. 94, in direct accord with the views we expressed upon the law applicable to the facts of this case. The motion for a rehearing is denied.