TERRITORY OF NEW MEXICO, Appellee, v. WILLIAM H. McGINNIS, Appellant.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—SELECTION OF JURY.—Section 9 of chapter 66, Laws of 1899, prescribes the manner in which talesmen shall be selected, and repeals section 941 of the Compiled Laws of 1897.

2. MURDER—PRACTICE—INDICTMENT—CONVICTION.—One who upon the evidence is found to be guilty of murder, as an accessory at the fact, and therefore a principal in the second degree, may be convicted under an indictment charging him as principal in the first degree.

3. ID.—An indictment sufficiently charging murder in the first degree will support a conviction of murder in the second degree.

4. CRIMINAL LAW—EVIDENCE.—Where there is a question whether an act was done by any person, any fact which supplies a motive for such an act is deemed to be relevant, and this is true although it may tend to show the accused guilty of another offense than the one charged.

5. MURDER—CONSPIRACY.—Where, upon a trial for murder, it appeared that the defendant, when the crime was committed, was in company with other persons, and the evidence left in doubt whether the fatal shot was fired by the defendant or by any one of his companions, the testimony for the prosecution tending to prove, however, that the defendant participated with his companions in the resistance of arrest which resulted in the homicide; and where there was evidence tending to prove that the defendant and the other persons had, prior to the time of the homicide acted in consort as conspirators in the commission of a felonious assault upon and robbery of a railroad train, and had thereafter been for several days associated in a common endeavor to escape apprehension by flight.—Held: That instructions by the court to the effect that if the jury believed the defendant to be a party to a conspiracy or common design to make violent opposition to arrest, and that in the carrying out of such conspiracy or common design the homicide in question was perpetrated by one of his co-conspirators, they might then hold the defendant guilty as if he himself had fired the fatal shot, and that if the jury believed the evidence as to the train robbery they were to consider it as a fact tending to show that a felony had been committed and that there was probable cause to believe that the defendant had taken part in such felony, and as evidence tending to show the motives of the different parties at the time the crime was committed, were proper and unobjectionable.

6. CRIMINAL LAW—ASSAULT UPON A RAILROAD TRAIN.—An instruction that an "assault upon a railroad train, that is what is known as 'holding up' such train," is a felony under the laws of the Territory.—Held: Under the circumstances of this case to be correct and unobjectionable.

7. CRIMINAL LAW—ARREST OF FELON.—The arrest of a felon may be justified by any person, without warrant, if a felony has in fact been committed, and an instruction laying down a contrary rule of law was properly refused.

8. CRIMINAL LAW—ARREST OF FELON—NOTICE TO.—One who is about to arrest a felon need give only such notice of his intention as could be expected, under all the circumstances of the case, of one governed by reason, good faith and honest purpose. The question whether this rule of conduct was observed in any particular instance is a mixed question of law and fact to be determined ultimately by the jury under proper instructions from the court.

9. MURDER—CONSPIRACY—PRINCIPALS.—One who is a party to a criminal conspiracy, the direct result of which is a murder perpetrated by one of his co-conspirators, and who is actually present assisting to the extent of his ability, in the accomplishment of a common design, is himself guilty of murder as principal, in the second degree, the extent and effectiveness of the assistance rendered by him being immaterial.

10. MURDER IN SECOND DEGREE—DEFINITION—HARMLESS ERROR.—An instruction defining murder in the second degree, though omitting therefrom any reference to the element of malice, is not erroneous, where the court in its charge had theretofore specifically instructed the jury that all murder was the unlawful killing of a human being with malice aforethought, either express or implied.

11. CRIMINAL LAW—COERCION OF JURY.—Remarks by the court to the jury that if they should not find a verdict by eight o'clock in the morning of the next day (Sunday) they would have to remain in their jury room until Monday morning, the court expecting to be absent from eight o'clock Sunday morning, until Monday morning, were not a coercion of the jury or prejudicial to the defendant in view of the state of the testimony and the length of the time the jury deliberated in this case.

*Appeal,* from the District Court of Colfax county, Fourth Judicial District. Affirmed.

EDWIN B. FRANKS and ANDRIEUS A. JONES, for appellant.

EDWARD L. BARTLETT, Solicitor-General, for appellee.

CRUMPACKER, J.—On September 19, 1899, in the district court of the Fourth judicial district of the Territory of New Mexico, within and for the county of Colfax, the defendant, William H. McGinnis, was indicted for the murder of one Edward Farr. On September 21, 1899, the defendant was arraigned and pleaded not guilty. The defendant filed a motion for a continuance, which was overruled. On October 2, 1899, the cause came on for trial, and on October 7, the jury returned a verdict of murder in the second degree against the defendant. He was sentenced to the penitentiary for life. Thereafter the defendant filed a motion in arrest of judgment and a motion for a new trial, which were overruled. Judgment was entered against defendant, whereupon he took an

appeal to this court. The record discloses the following important facts in the case: That on July 16, 1899, a posse of seven members organized by the United States Marshal for the District of New Mexico, under telegraphic direction from the Attorney General of the United States, while in pursuit and upon the trail of a band of felons, known to be three or more in number, who, on the night of the 11th of July, 1899, held up and robbed of expressage a passenger train carrying the United States mail on the Colorado Southern system of railway in New Mexico, suddenly in a secluded and rugged place in the mountains of Colfax county, New Mexico, came upon the objects of their search; that one of the felons was believed to be a notorious desperado, named Sam Ketcham, for whom the United States Marshal held a warrant, charging him with a violation of the postal laws theretofore committed. The testimony of the witnesses for the prosecution tended to prove that the designated leader of the posse, Wilson Elliott, being the first to see the defendant, McGinnis, called upon him in a tone of voice which he believed loud enough to be heard by defendant from a distance of about fifty yards, to surrender; that thereupon the defendant, who was in motion, instantly stopped and raised to his shoulder what Elliott believed to be a gun, and that instantly, thereupon, shots were exchanged simultaneously between other members of the posse and the defendant and those with him. This the defendant denied, testifying that he was at the time on his way from the camp to a spring of water a few yards distant, for a pail of water and unarmed. The evidence is conflicting upon the question from which side the report of the first shot came, but it is clear from the testimony of all the witnesses for the prosecution that the first report of the rifles from the opposing parties came so close together as to be almost indistinguishable. At first firing the defendant fell wounded. Shots continued to be rapidly exchanged between the posse and the defendant's associates for about ten minutes. The effect of the shots from the felons was the shooting of Edward Farr through the heart, causing his instant death, and the wounding of two other members of the posse; and the effect of the shots from the posse was the mortal wounding of Sam Ketcham and the wounding

of defendant.  The shooting having ceased, both parties re-
tired, the posse to care for their wounded and the defendant
with his confederates to make good their escape.  The con-
tinued vigilance of the authorities, however, resulted in the
apprehension of the defendant on the sixteenth of August,
1899, by the sheriff of Eddy county, New Mexico, who, with
his posse, came upon the defendant at a point in southeastern
New Mexico, some three hundred miles from the place where
Farr was killed.  The defendant then again offered most
strenuous resistance to arrest by the officers, wounding by
shooting one of that posse and also an old man whom he sus-
pected of having betrayed his whereabouts to the authorities.
The prosecution in the course of the trial also proved, be-
sides other material facts, the whereabouts of the defendant
and his confederates a few days prior to the assault upon
the train; their sudden disappearance, their presence next
near the scene of the assault and robbery early on the night
of the hold-up; identified the defendant and his dead con-
federate, Sam Ketcham, as two of the men engaged in that
assault; established the flight of the defendant and his con-
federate from the scene of the assault and the fact that
within a few hours thereafter the authorities were in pursuit
and upon their trail, which pursuit, with some interruptions
and delays, caused by the weather, and formally organizing
the marshal's posse, was continued down to the time of the
fatal encounter in the mountains.  The first incriminating
evidence found was the torn letter addressed to Franks, one
of the bandits, discovered early on the day following the
assault by Sheriff Titsworth at the place where the defend-
ant and his confederates had been observed camped the day
of the hold-up in the vicinity of the scene of the assault;
and at the mountain camp of the defendant and his con-
federates property was discovered which was identified as
having been stolen from the car of the train which had been
assaulted.  The testimony as to what took place at the
time of the assault upon the train goes to prove that the de-
fendant himself assaulted the fireman and the express mes-
senger with deadly weapons; that he and his confederates fired
many shots into both sides of the train; that they entered the

combination baggage and express car and dynamited the safes
therein, thereby wrecking the safes and partly demolishing the
car, and that they secured and carried away certain express
matter therefrom.

The first error alleged is as to the manner in which the
jury that tried defendant was selected. In the selection of a jury
to try the defendant, the regular panel being exhausted, two
special venires were drawn by two commissioners acting for
that purpose with the judge of the court for qualified persons
to fill the petit jury panel, and the jury which tried the defend-
ant was in part constituted of persons so selected. It is con-
tended by counsel for appellant that a jury
thus selected is not legally selected and that
CRIMINAL law:      talesmen should have properly been drawn by
selection of a
jury.              virtue of section 941 of the Compiled Laws of
1897. However, section 9, chapter 66 of the
Session Laws of 1899, governs such procedure,
and from the record it is plainly to be seen that the court fol-
lowed the procedure there prescribed. The act embracing
said section 9, in relation to the selection of jurors, was in-
tended to be and is a complete new system, and section 941 of
the Compiled Laws of 1897, was thereby repealed, section 9
above referred to, taking its place.

It is further contended by counsel for defendant that un-
der the indictment in this case the defendant could not be con-
victed on the theory that he was present, aid-
ing and abetting. They argue that there is
MURDER: prac-      evidence in the case tending to show that the
tice: indict-
ment: convic-      defendant did not fire a single shot and took
tion.              no part in the actual shooting between the al-
leged train robbers and the posse, and that the
defendant, if guilty of any crime, was guilty as principal in the
second degree, because of his being present, aiding and abetting
the person or persons who committed the homicide. The ques-
tion for determination here then is not what the evidence in
the case is, but whether the indictment would authorize a con-
viction on the theory that the defendant was an accessory at
the fact. The law is well settled that an accessory at
the fact is deemed equally guilty with the principal, and is
designated as principal in the second degree. To constitute this

form of connection with the offense the accused must have been present when the offense was committed, although his presence might be constructive. Those who being present aid and abet, or are present for that purpose, although they do no overt wrongful act whatever, are principals in the second degree. McClain's Crim. Law, Sec. 205, and cases cited. Wharton's Crim. Law, Sec. 116. There is no distinction whatever either in the guilt or in the method of procedure between the two. State v. Davis, 29 Mo. 391; Wharton's Crim. Law, Sec. 129. The court, therefore, rightly refused defendant's instruction No. 15, laying down the proposition that under the indictment in the case the defendant could not be convicted as an aider and abettor. The indictment in this case sufficiently charging murder in the first degree, is, therefore, sufficient to support a conviction of an accessory at the fact for murder in whatever degree the jury should find by their verdict. McClain's Crim. Law, Sec. 389, and cases there cited. Tenorio v. Territory, 1 N. M. 280.

ID.

We are aware that in the case of the Territory v. Borrego, 8 N. M. 474, views were expressed by this court to the effect that such an indictment charged murder in the first degree exclusively, and will not sustain a conviction of murder in any of the lower degrees. We regret to say that with those views we are constrained to differ, and that we can not follow them as correctly and authoratively stating the law.

Defendant also complains of the action of the trial court in overruling his objections to the introduction of any evidence which might in any way tend to prove that the defendant on the eleventh day of July, 1899, had participated in an assault upon a railway train upon the ground that such evidence was irrelevant and prejudicial to defendant. The theory upon which the court permitted this evidence to be given to the jury was that it tended to show a motive for the homicide. Where there is a question whether an act was done by any person, any fact which supplies a motive for such an act is deemed to be relevant, and this is true, although it may tend to show the accused guilty of another offense than the one

CRIMINAL law:
  evidence.

charged. People v. Wilson, 49 Pac. 1054; 117 Cal. 688; State
v. Low, 50 Pac. 912; 6 Kan. App. 110; People v. Craig. 111
Cal. 460; People v. Lane, 36 Pac. 502; Chase's-Stephen's Di-
gest of Law Ev. Art. 7, pp. 19, 21, 35, and cases cited. Any
facts tending to prove that the defendant had with others con-
spired to commit a felony; that in pursuance of such unlawful
conspiracy a felony had in fact been committed, that the felony
was of such a character that the law might, upon conviction of
the felons, exact as the penalty the forfeit of their lives, and
that the felons were fleeing from justice on account thereof,
may very readily evince a cogent motive to have existed in
the minds of the defendant and those associated with him, for
the commission of the homicide and are, therefore, relevant to
the issues in this case.

A further objection of counsel for appellant is based upon
the giving of instruction, number 8, which lays down as ap-
plicable to the evidence in the case the law defining the respon-
sibility of one who is a party to a conspiracy to
do a criminal act for a crime committed by his
**MURDER:** con-    co-conspirators in the accomplishment of the
spiracy.
common design; to instruction numbered 14,
which instructed the jury that the 'hold-up' of
a railroad train is a felony under the laws of the Territory, and
that one who has committed such a felony is liable to arrest,
without warrant, by any person or persons, whether sworn of-
ficers or not; and to instruction numbered 15, which directed
the jury that, if they believed that the train robbery had been
committed as testified to, they might consider it as a fact "to be
considered. . .in showing that a felony had been committed. . .
and there was probable cause to believe that defendant had
taken a part in such felony. . . .and as evidence to be considered
. . . .in ascertaining the motives of the different parties engaged
in the fight near Cimarron." We cannot follow counsel in their
intimation that these instructions permitted the jury to convict
the defendant, if they believed him to be an accessory before
the fact. Neither can we assent to their proposition that the
court erred in presenting to the jury the principle of law gov-
erning conspirators and principals in the second degree. It is
urged upon us that the only conspiracies or common designs in

which the accused could in any view of the evidence be held
to have been a participant are conspiracies to commit the train
robbery and a plan to escape arrest after the robbery was com-
mitted; and it is argued that, inasmuch as the robbery took
place five days before the commission of the crime alleged in
the indictment, and at a place seventy miles away, the crime
last mentioned could in no way be regarded as a result trace-
able directly to the conspiracy to rob the train, and that, there-
fore, the existence of such a conspiracy was a fact irrelevant
to the question of the guilt or innocence of the accused. As
to the common plan to escape, it is argued that as mere flight is
no crime in itself, such a plan is not a criminal conspiracy at
all. These arguments we are constrained to regard as more in-
genious than helpful in the case at bar. It is plain that the
learned judge, when he delivered the 8th instruction, had ref-
erence neither to the robbery nor to the flight that followed it,
but to a common plan of the defendant and those with him to
make violent resistance to arrest. This is so manifest in the
words of the instruction itself that no argument could make it
plainer. The testimony as to what took place immediately be-
fore the shooting is conflicting, and it was for the jury to pass
upon the credibility of the witness and to decide whether the
defendant aided or endeavored to aid his companions in their
resistance, or whether he remained passive. The testimony for
the prosecution tended strongly to prove that the defendant,
when called upon to surrender, was armed, and endeavored to
discharge his weapon (if he did not in fact do so), before any
shots were fired; and it also tended strongly to show that he
was within sight of and in proximity to his companions before
and after the firing began. The facts that he had been asso-
ciated with Franks and Ketcham in the making and consumma-
tion of the plan to rob the train and in the long flight that fol-
lowed, were clearly admissible as tending to show both that
there existed in his own mind a strong motive to make violent
resistance to arrest, and that the same motive existed in the
minds of those with whom he was associated when the partic-
ular crime under examination was perpetrated. The question
whether the defendant himself did or did not commit the crime
for which he was under indictment being in issue, the fact of

the existence or non-existence of the motive for such an act was a relevant and very important inquiry. And there being before the court the further question whether, supposing the shooting to have been done, not by the defendant, but by his companions, there existed such a common design and purpose between him and them as would, in law, render him liable for their criminal acts done in its prosecution, the existence in the minds of all of the same motive to commit an act, the direct result of which was the homicide in question was an equally relevant and no less important inquiry. We are also of the opinion that proof of the relations of the defendant with Franks and Ketcham was admissible because of its tendency to show, when considered with the other facts in evidence, a deliberate agreement among them to oppose force to any attempt to apprehend them; but it was not requisite in our view of the case that the jury should be convinced of a preconcerted plan of forcible opposition prior to the time when the felons were discovered in their camp. The common design might well have been suggested and assented to after the arrival of the posse at the scene of the homicide. Nor was verbal communication necessary. Acts are often more eloquent than words. Especially is this true where the minds of the parties have been prepared by a common experience resulting in an identity of interest or motive. Under such circumstances a single gesture or other act, as the raising of a gun might be sufficient to conclude a perfect understanding instantly.

Further objection is made to instruction number 14 because the court instructed the jury that under the laws of this Territory, assault on a railroad train, that is, what is known as "holding up" such train, is made a felony; counsel for appellant contending that a mere assault upon a railroad train without intention to commit murder, robbery, or any other felony upon the person of some one connected with said train is not a felony. Section 1151 of the Compiled Laws of 1897, is as follows: "If any person or persons shall wilfully and maliciously make an assault upon any railroad train, railroad cars or railroad locomotive within this Territory for the purpose and with the intent to commit

CRIMINAL law;
assault upon
railroad train.

murder, robbery or any other felony, upon or against any passenger on said train or cars, or upon or against any engineer, conductor or fireman, brakeman or any officer or employe connected with said locomotive, train or cars, or upon or against any express messenger, or mail agent on said train, or in any of the cars thereof, on conviction thereof, shall be deemed guilty of a felony, and shall suffer the punishment of death." We think that the language of the court stated the law correctly in terms readily comprehensible to the jury. There is no ambiguity about the phrase "holding up" when used in relation to an attack upon a train; on the contrary those words are distinctly and universally understood to mean the forcible detention of a train with intent to commit a robbery or some other felony, and under the circumstances of this case, we think the jury could not possibly have misunderstood the sense in which the court employed them.

Objection is also made by counsel for appellant to instructions numbered 18 and 20, asked for by the Territory and given by the court, on the ground that the court thereby left it to the jury to decide what notice should have been given by the posse under the circumstances, or whether any notice should have been given. In substance, the court thereby told the jury that where a posse was in pursuit of a felon the members of the posse had the right to be governed by the actual surroundings, and are required to give no greater warning than good faith and honest purpose requires under the circumstances then existing, and that whether the posse did all the acts which could reasonably be expected from them before they began firing was a matter for the determination of the jury under all the evidence in the case. No definite and fixed rule of law can be laid down as governing the conduct of one who is about to arrest a felon. While it is true that as a general rule it is incumbent upon the person arresting to give to the person sought to be arrested some notice of his intention, the action of the party sought to be arrested may be such as in law to dispense altogether with such requirement. The conduct of the person arresting must be determined by the circumstances of each particular case. Much depends upon the known

CRIMINAL law: arrest of felon.

or suspected character of the accused and upon his action prior to the time when the arrest is attempted. What does the law exact of a person who, while rightfully in pursuit of one known or reasonably believed to be a desperate criminal, is confronted by the object of his pursuit with a deadly weapon in his hands and apparently in the act of employing it against his pursuer? It can not be seriously contended that in such an event the pursuit must be abandoned and the felon be permitted to escape? What then? Does the law require of the pursuer that he stand inert, while in imminent peril of his life, taking no measures to save himself, until he shall have announced his purpose in deliberate words? Clearly not. That would be sheer folly and the law exacts folly of no man. One so situated might be justified in taking life for the double purpose of protecting himself and of preventing the escape of the felon. No more definite rule can be laid down than that the arresting person should give notice of his character and purpose, if the giving of such notice be consonant with the obvious dictates of prudence, due regard being had for the situation in which he finds himself.

CRIMINAL law: arrest of felon: notice to.

The court properly instructed the jury that the members of the posse were required to give no greater warning than good faith and honest purpose required under the circumstances existing at the time. It was for the jury to decide what those circumstances were and whether the posse acted as reasonable men would have acted in like situation. The question was one of mixed law and fact. State v. Gay, 44 Pac. 411; People v. Coughlin, 44 Pac. 423; U. S. v. Starr, 163 U. S. p. 20; McClain's Crim. Law, Sec. 328.

Objection is also made to instructions numbered 24 and 25 asked by the Territory and given by the court, whereby the jury were instructed, in effect, that if an agreement had been made to resist arrest by the defendant and his alleged associates, and they were each doing what he could with a common design and intent to resist their arrest, and to kill any or all of the posse so seeking to effect their arrest, and while they were so acting the deceased was killed by either of the defendant's associates, their act would be as much the act in law of the defendant as if he himself fired the gun which gave the fatal shot.

The objection to these instructions is based upon the view of the evidence, as taken by the defendant, that at the time of perpetration of the homicide he had been wounded and was not able to do anything. But the question is whether the instruction states the law as applied to any view of the evidence. If the jury believe that the defendant was a party to a conspiracy to resist arrest and that he was actually present when the arrest was resisted in fact by his co-conspirators, and that he actually assisted them in their unlawful purpose, then they were entitled to convict him as a principal. The extent and effectiveness of the assistance rendered by him is quite immaterial. These instructions stated the law and defendant's proposed instructions numbered 6 and 8, asking the court to instruct the jury to the contrary, hereto, were properly refused by the court.

*MURDER: conspiracy: principals.*

Further objection is made by counsel for defendant based upon instruction number 9, whereby the jury were instructed in part as to what constituted murder in the second degree, because the court omitted therefrom direct reference to the element of malice. However, this objection is without merit, because by instruction numbered four, the court gave to the jury the definition of murder in all the degrees as defined by our statutes (sections 1060 to 1065, Compiled Laws of 1897) and specifically instructed the jury that all murder was the unlawful killing of a human being with malice aforethought, either express or implied, and defined both express and implied malice. The court very carefully connected this instruction, numbered 9, with the instruction already given to the jury, and it was not necessary for the court to rehearse the law concerning the element of malice after it had been so fully discussed in the fourth instruction.

*MURDER in second degree: definition: harmless error.*

That the arrest of a felon may be justified by any person without warrant if a felony has, in fact, been committed, has been so often and so unanimously laid down by all the authorities as the law, as to call for nothing more than its reiteration here, to support the action of the court below in refusing defendant's proposed instruction numbered five. A. & E. Enc.

of Law, (1st Ed.) Vol. 1, p. 741, and cases cited; Wharton's Crim. Law (8th Ed.) sections 433 and 434.

And lastly counsel for appellant contends that this case should be reversed on the ground that the remarks of the court to the jury at the close of its charge, on October 7, 1899, were a coercion of the jury and prejudicial to the defendant. The court told the jury that if they agreed upon a verdict at any time before eight o'clock the next, Sunday, morning, the court would be there to receive it, and that if the jury should not arrive at a verdict by that time, it would be necessary for them to remain together from eight o'clock, Sunday morning, until the next, Monday morning, as the court would be absent in Las Vegas on Sunday. From the record it appears that the jury had heard all of the evidence in the case on the sixth, and the arguments of counsel and the charge of the court on the seventh, Saturday, and that "after due deliberation the jury returned into court their verdict" on the night of the seventh. There is nothing whatever to show that the jury was influenced in its conclusion by the remarks of the court, nor do we think that the defendant was prejudiced thereby. In view of the state of the testimony and the length of time the jury deliberated, we think it clear that their conclusion was not influenced by any other consideration than the evidence, arguments and the instructions. State v. Smith, 61 Am. St. 225; 99 Iowa 26.

*CRIMINAL law: coercion of jury.*

We think from the record before us that the appellant had a full and fair trial and that there was no prejudicial error in any of the rulings of the court complained of in the motion for a new trial or in appellant's brief. The verdict being fully sustained by the evidence, the judgment of the district court is affirmed.

McFie and Parker, JJ., concur.