This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

**v.**                                                   NO. 32,529

**JOSEPH EVANS**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY**
**Robert A. Aragon, District Judge**

Jacqueline Cooper, Acting Chief Public Defender
B. Douglas Wood, III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Law Office of Daniel F. Haft
Daniel F. Haft
Santa Fe, NM

for Appellee

**DECISION**

**CHÁVEZ, Justice.**

{1} On September 12, 2005, sixteen-year-old Felicia Penaloza's body was found under a bridge in the "Death Wash" creekbed. Felicia had a black plastic bag covering her head, secured around her neck with an electrical wire ligature. Felicia's body was found partially wrapped in a bed sheet tied around her body with a rope. Police searched the basement of the home where Defendant Joseph Evans lived and discovered electrical wire, rope, and plastic garbage bags similar in appearance to those found on Felicia's body. In separate interrogations conducted on September 18 and 19, 2005, Evans made two lengthy statements confessing to Felicia's murder.

{2} On April 17, 2007, Evans moved to suppress the physical evidence and the two confessions. The trial court denied Evans's motion to suppress the confessions and granted his motion to suppress the physical evidence. Both parties appealed to this Court. On May 27, 2009, this Court affirmed the trial court's denial of Evans's motion to suppress his statements, and reversed the court's order suppressing the physical evidence. *State v. Evans*, 2009-NMSC-027, ¶ 55, 146 N.M. 319, 210 P.3d 216.

{3} On remand, a jury found Evans guilty of first-degree murder and tampering with evidence. Evans appeals his convictions and raises the following five issues on appeal: (1) whether there was sufficient evidence to support a finding of deliberate

intent; (2) whether the trial court abused its discretion in denying his motion for a change of venue; (3) whether the trial court abused its discretion in denying his motion for a mistrial after a State's witness mentioned that Evans had previously been in prison; (4) whether the trial court erred in denying his request for a special interrogatory that required the jury to answer whether it unanimously agreed that his confessions were voluntary; and (5) whether the cumulative effect of the errors deprived him of a fair trial. Because we conclude that there is sufficient evidence to support a finding of deliberate intent to murder and the trial judge did not abuse his discretion in denying Evans's various motions, we affirm the convictions.

## I. THE EVIDENCE WAS SUFFICIENT TO SUPPORT A FINDING OF DELIBERATE INTENT.

{4} Evans argues that there was insufficient evidence to prove that he had the deliberate intent to kill Felicia. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted). In applying this standard, we review the evidence in the light most favorable to the verdict. *Id.* Focusing on the element at issue, we ask whether any rational juror could have found evidence supporting the

element beyond a reasonable doubt. *Id.*

{5}    To establish first-degree murder, the State must show that the defendant killed the victim with the deliberate intention to take away the victim's life. *State v. Rojo*, 1999-NMSC-001, ¶ 20, 126 N.M. 438, 971 P.2d 829; UJI 14-201 NMRA. Deliberate intent is "a result of careful thought and the weighing of the consideration for and against the proposed course of action." *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (internal quotation marks and citations omitted). Because intent is subjective, the jury may infer intent from other facts in the case. *Id.* Notably, a calculated judgment may be reached in a short period of time. *State v. Garcia*, 114 N.M. 269, 271, 837 P.2d 862, 864 (1992).

{6}    Evans emphasizes that it is not enough that he had enough time and opportunity to form a deliberate intent, relying on *Garcia*, 114 N.M. at 275, 837 P.2d at 868. In *Garcia*, we reversed a jury verdict for first-degree murder, concluding that there was no evidence of deliberation. 114 N.M. at 274, 837 P.2d at 867. The *Garcia* Court reasoned that the only evidence of motive or thought with respect to the murder was that the defendant and the victim had a fist fight, made up, and then had another fist fight, which ended with the defendant fatally stabbing the victim. *Id.* at 274-75, 837 P.2d at 867-68. Based on *Garcia*, Evans contends that absent evidence he

4

considered his actions and chose to choke Felicia with the goal of causing her death, there is simply no evidence upon which the jury could infer that he deliberately intended to cause her death.

{7}     The State responds that it provided substantial, if not overwhelming, evidence to support a first-degree murder conviction, citing to *Rojo*, 1999-NMSC-001, ¶ 20. In *Rojo*, the victim's body was left in a dumpster, wrapped in garbage bags, and found with a plastic bag covering her head and a jump rope tied around her neck. *Id.* ¶ 2. The medical examiner in that case testified that the killing was a homicide and the cause of death was ligature strangulation. *Id.* ¶ 4. The medical examiner further testified that the killer would have needed to strangle the victim for several minutes to kill her. *Id.* Notably, there was no physical evidence linking the defendant to the victim's body. *Id.* ¶ 5. However, there was evidence that the defendant was the last person seen with the victim on the day of the murder and the defendant had a motive to kill the victim. *Id.* ¶¶ 6, 7, 12.

{8}     In *Rojo*, this Court upheld the jury's finding of deliberate intent to murder, emphasizing the medical examiner's testimony that it would take at least several minutes to kill a person by strangulation. *Id.* ¶ 24. The Court reasoned that when combined with evidence concerning the defendant's motive for the killing, the

evidence of a labored method of causing death would allow the jury to infer that the defendant effected the killing with the deliberate intent to take the victim's life. *Id.*

{9}     We agree with the State that the case before us is controlled by *Rojo*. Here, as in *Rojo*, there is evidence that Evans applied a choke hold for seven to eight minutes until Felicia stopped moving. Dr. Ian Paul, the medical examiner who conducted the autopsy on Felicia, testified as an expert that the manner of Felicia's death was homicide. Dr. Paul concluded that the cause of death was asphyxia from ligature strangulation and airway obstruction from the plastic bag. He also testified that the use of a choke hold also could have killed her. Similar to the medical examiner's testimony in *Rojo,* that it would take several minutes to kill a person by strangulation, Dr. Paul's testimony provides evidence of a method of killing that takes an extended period of time to complete. *See State v. Taylor*, 2000-NMCA-072, ¶ 22, 129 N.M. 376, 8 P.3d 863.

{10}     However, Dr. Paul's testimony is not the only evidence that supports a finding of deliberate intent murder. There was evidence of both a motive to kill and a plan to murder Felicia. Evans's aunt, Caroline Cordova, testified that she lived with him and his mother at the time of Felicia's death. She testified that Evans brought Felicia to their home during the evening of Saturday, September 3 or Sunday, September 4,

2005. She stated that she observed Felicia and Evans go into the basement. She then testified that Evans woke her up several times that night, once to ask for the car keys. She stated that another time she woke up because she heard strange noises. She observed Evans's minivan parked outside and saw Evans placing what looked like a rolled-up rug into the van. She went to the front door to ask Evans what he was doing. In response Evans ran up to her, pushed her back inside the house, and told her he was only throwing out the garbage. She thought this was odd because the landfill was closed and she did not see anyone else in the driveway or any other vehicles at the house. She also noted later that she had witnessed Kenneth Durante on September 15, 2005, a week after the crime, going through the family's trash, appearing to be nervous and agitated.

{11} Agent Henrietta Soland testified regarding Evans's confessions. Evans's two statements were admitted as Exhibits 25A, 25B, 25C, 27, 27A, and 31. In his first confession on September 18, 2005, Evans indicated that earlier on the day of her death Felicia had threatened him that she was "gonna get everyone [sic] of you" by reporting him and his family to the police. Testimony during the trial established that Evans's aunt, his mother, and his brother regularly smoked methamphetamine. Evans admitted that he later took Felicia down to the basement of his residence and placed

7

her in a choke hold for a number of minutes until she became quiet and stopped moving. He claimed that he choked her because she became hysterical and unruly, threatening to "rat everybody out," including himself, his mother, his aunt, and his brother. He also confessed that after choking Felicia he spoke on the phone to Kenneth Durante, and Durante told him he'd call back later to see if Evans had "take[n] care of the garbage." Durante had also been a user of methamphetamine.

{12}   In addition, Evans confessed to placing a plastic bag over Felicia's head secured with a piece of electrical cord wrapped around her neck. He confessed that after choking her he looked at her and thought to himself "what the fuck did you do," moved her into the other room, and put the bag over her head because he did not want to see her "like that." During this confession, Evans also said that he called Durante again after placing the bag over Felicia's head, to tell him that "she's out of the world . . . I threw the trash away."

{13}   During his second confession, Evans confessed to luring Felicia down to the basement by lying to her that her boyfriend Sefarino Griego would be there. Evans claimed that Durante killed Felicia while Evans was upstairs getting some sodas. However, Evans again confessed to choking Felicia for seven to eight minutes to calm her down, putting the garbage bag over her head, and tying the extension cord around

8

her neck. Additionally, he confessed for the first time to moving the body into the garage, loading it into his van, driving it to a bridge, and dumping the body into Death Wash creek.

{14} Similar to the facts in *Rojo*, the evidence summarized above supports a motive to kill, which was Felicia's threat to "rat out" Evans and his family to the police. Evans's confessions provide evidence that he planned to murder Felicia when he called Durante and discussed disposing of her body. The evidence of both a motive and a plan materially distinguishes this case from *Garcia*, upon which Evans relies. Thus, as in *Rojo*, the jury could have properly inferred from the evidence that Evans formed the deliberate intent to kill Felicia either before beginning to choke her or during the several minutes required to cause her death.

## II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING EVANS'S MOTION FOR A CHANGE OF VENUE.

{15} Evans next argues that he was denied a fair trial when he was denied a change of venue. We review a trial court's decision on whether to grant a change of venue for abuse of discretion. *State v. Chamberlain*, 112 N.M. 723, 726, 819 P.2d 673, 676 (1991). Evans suggests that the "right to a venue change is . . . mandatory and must be granted by the trial court." However, as we stated in *State v. House*, 1999-NMSC-014, ¶ 29, 127 N.M. 151, 978 P.2d 967, where a party files a motion for change of

9

venue, if the trial court requests an evidentiary hearing on the issue, the right to a change of venue is no longer mandatory, but rather is left to the trial court's discretion.

{16} To support a change of venue, the movant must show "a reasonable probability that a fair and impartial trial is unlikely in a particular venue." *Id.* ¶ 36. We have identified a non-exclusive set of factors for a trial court to consider in its search for prejudice, including (a) the neutrality and timing of the publicity; (b) the form in which the publicity is disseminated; (c) the size and nature of the community; (d) demonstrated actual prejudice by potential jurors; and (e) inflammatory comments by politicians. *Id.* ¶¶ 57-72. However, when a trial court does not find presumed prejudice and proceeds with voir dire, this Court limits its review to actual prejudice. *State v. Gutierrez*, 2011-NMSC-024, ¶ 43, 150 N.M. 232, 258 P.3d 1024.

{17} In support of his motion, Evans identified eleven articles published in the *Gallup Independent* over the course of three years that described the murder, the subsequent investigation, and his previous appeal to this Court. The first set of articles basically mentioned the charges against Evans, the circumstances under which Felicia's body was found, and a possible motive for the murder. On September 28, 2005, an article that contained Evans's photograph described his criminal history of

10

larceny and embezzlement. On November 29, 2005, another article noted the charges against him and a potential motive for Felicia's murder. On August 5, 2006, over 8 months later, another article discussed where Felicia's body was found, suggested that she had been suffocated inside Evans's basement, and mentioned a possible motive. On August 30, September 12, and September 28, 2006, further articles discussed how Felicia's body was found under the bridge, and stated that Evans was arrested and charged with murder and tampering with evidence in connection with her death.

{18} The second set of articles also mention Evans's confessions. On December 4, 2006, an article stated that Evans had "admitted being involved in the killing." On January 13, 2007, an article mentioned the charges against Evans and his confessions. On May 19, 2007, an article noted that Evans had been released from the county jail, he had confessed multiple times to the murder, and the district attorney believed Evans was a danger to the community. On June 21-22, 2008, an article mentioned that Evans had repeatedly confessed to this crime, discussed where the body was found, and stated that Evans wanted to change churches. The last of these articles was published a year and a half before Evans's trial began.

{19} Finally, on May 28, 2009, another article announced this Court's previous opinion, and again summarized the charges against Evans, where and how Felicia's

body had been found, and the suspected cause of death. As additional support for his motion to change venue, Evans presented the testimony of his wife that their family had tried to attend three different churches, but had felt unwelcome at each one. The trial court denied the motion to change venue.

{20} Evans emphasizes that Gallup is a small city with a population of twenty thousand people, and because the *Gallup Independent* is the primary newspaper for this small community, its imbalanced reporting should have led to a court finding of presumptive prejudice. It is the timing of the publicity that persuades us that the trial court did not abuse its discretion in denying the motion for a change of venue. As we stated in *House*, "[i]f detrimental articles and broadcasts appeared months or years before the beginning of a trial, the probability of prejudice is significantly reduced." 1999-NMSC-014, ¶ 60.

{21} In this case, most of the publicity which Evans contends was prejudicial occurred between September 28, 2005 and June 22, 2008, nearly a year and a half before his trial began on November 16, 2009. The last identified article containing potentially prejudicial information was published in the June 21-22, 2008 weekend edition of the *Gallup Independent*. The only identified article published after this date, the May 28, 2009 article, was a neutral article summarizing this Court's decision

regarding Evans's interlocutory appeal, as well as where and when Felicia's body had been found and the suspected cause of death. In addition, Evans's attorney conceded at the hearing on the motion to change venue that the newspaper evidence was "not the . . . main thrust" of their motion nor their "strongest argument," and was presented really "by way of background" to show that members of the community were aware of the case. Consequently, the trial judge could have reasonably concluded that the probability of juror prejudice resulting from these articles had significantly diminished because of the extended period of time without publicity between the last prejudicial publication and the start of the trial.

{22} Evans also relies on his personal experience at three different churches in arguing that the community was prejudiced against him. He presented evidence through his wife's testimony that he was made to feel unwelcome at three different churches in the city of Gallup. Evans's attorney candidly conceded that the feelings of these church members were "not necessarily a microcosm of McKinley County." Indeed, at one of those churches he was asked by the pastor to leave because a member of Felicia's family attended services there and did not feel comfortable having Evans there too. Given this information, the trial court could reasonably find that this evidence was not sufficient to demonstrate the feelings of the general

13

community.

{23} Moreover, because the trial court permitted this case to proceed to voir dire, the relevant test is whether the jury that was seated contained jurors harboring actual prejudice. *Gutierrez*, 2011-NMSC-024, ¶ 43. As evidence of actual prejudice, Evans points to Jurors 18 and 52, who were both seated. Juror 18 indicated that he knew the father of one of the State's witnesses, Sefarino Griego, but he did not know witness Griego. Juror 52 indicated that he knew the district attorney, witness Henrietta Soland, and witness Sefarino Griego. The State responds that neither of these jurors indicated any bias based on pretrial publicity, and Juror 52 testified that he would treat the testimony of the known witnesses the same as any other witness.

{24} The State is correct that the seating of these jurors does not indicate that the jury was actually prejudiced. The defense had an extensive opportunity to identify and exclude biased individuals in the venire panel. The trial court allowed the defense to present the venire panel with written questionnaires and to conduct extensive individual questioning regarding pretrial publicity and other potential biases. Despite the opportunity to question potential jurors in writing and in person, Evans simply was unable to develop evidence that the jurors who were actually seated had been tainted by pretrial knowledge of the case. Out of the eighty-four prospective jurors on the

14

panel, only seven (seat numbers 5, 10, 13, 22, 60, 87, and 96) indicated some bias based on pretrial publicity, and all seven were excused for cause. In addition, several other jurors who failed to complete Evans's questionnaire were also excused for cause. Notably, Jurors 18 and 52 did not fall into either of these two categories. These facts support a finding that the jurors who were seated did not harbor any prejudice against Evans. Therefore, the trial court did not abuse its discretion when it denied the motion for a change of venue.

## III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE MOTION FOR A MISTRIAL.

{25} Evans also claims that he was denied a fair trial based in part on the trial court's failure to grant a mistrial after one of the State's witnesses, Sefarino Griego, mentioned during his direct examination that Evans had previously been in prison. We review a trial court's denial of a mistrial based on a prejudicial remark for an abuse of discretion. *State v. Fry*, 2006-NMSC-001, ¶ 53, 138 N.M. 700, 126 P.3d 516. Evans argues that this Court presumes that a reference to a defendant's prior criminal record is prejudicial unless the evidence of guilt is so "overwhelmingly persuasive that under no reasonable probability could the [inadmissible evidence] have induced the jury's finding of guilt" (quoting *State v. Gutierrez*, 93 N.M. 232, 235, 599 P.3d 385, 388 (Ct. App. 1979) (internal quotation marks and citation

omitted)). However, Evans's argument ignores the fact that where the prosecution did not intentionally elicit the prejudicial remark at issue, we have held that the trial court's offer to give a curative instruction cures any prejudicial effect. *Fry*, 2006-NMSC-001, ¶ 53.

{26}     In this case, it does not appear that the State intentionally elicited the prejudicial remark.   The testimony in question is Mr. Griego's testimony that Evans had previously been in prison.   The State argues that the prosecutor did not elicit this testimony.  Evans appears to concede this point, admitting that "the prosecutor did not necessarily seek evidence of prior bad acts in this matter."   Further, a review of the transcript also supports the conclusion that the State did not intentionally elicit the inadmissible remark.   The prosecutor asked, "When did you meet [Evans]?"   Mr. Griego responded, "I met him for the first time early 2002, I'm not real sure, it was, it was, uh, before I moved to the trailer.  It was, I would say, 2002."   The prosecutor then followed up, asking, "And in what environment did you, uh, meet [Evans]?"   Mr. Griego answered, "He showed up at my house one day."   Mr. Griego then continued, "I guess he had just gotten out of prison."   Presumably, the "environment" that the prosecutor intended to identify was Mr. Griego's house.   While the question was broad and awkward, it does not indicate an intentional plan to expose Evans's prior

16

stint in prison.

{27} Additionally, immediately after the comment was made, Evans's counsel objected, and the trial court instructed the jury to "ignore and completely disregard the statement inadvertently made by the witness concerning the possibility that the defendant may have been a convict in, in prison. Ignore that, it has absolutely no role in your deliberations." Because the prosecution did not intentionally elicit the prejudicial comment, and because the trial court gave a curative instruction, the trial court did not err in denying Evans's motion for a mistrial.

## IV. EVANS WAS NOT ENTITLED TO A SPECIAL INTERROGATORY REGARDING THE VOLUNTARINESS OF HIS CONFESSIONS.

{28} Finally, Evans argues that he was denied a fair trial when the trial court denied his special interrogatory to the jury clarifying that the jury had to "unanimously" find that Evans's first confession was voluntary. We review a trial court's denial of a jury instruction de novo. *See State v. Nozie*, 2009-NMSC-018, ¶ 33, 146 N.M. 142, 207 P.3d 1119. Quoting *State v. Trammel*, 100 N.M. 479, 481, 672 P.2d 652, 654 (1983) (internal quotation marks omitted) in his brief in chief, Evans argues that "[w]hen evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error." Quoting *Nozie*, 2009-NMSC-018, ¶ 36 (internal quotation marks and citation omitted) in its answer brief, the State responds

17

that "a defendant is not entitled to a specific instruction where the jury has already been adequately instructed upon the matter by other instructions."

{29}     Here, the trial court issued both the uniform jury instruction on voluntariness of statements, UJI 14-5040 NMRA, and the uniform jury instruction that instructed the jury that its decision on the voluntariness of Evans's statement must be unanimous, UJI 14-6008 NMRA.  UJI 14-5040 instructed the jury that it must determine whether Evans's statements were given voluntarily before it could consider the statements for any purpose.  Evans argues that because the instruction on unanimity was given after the instruction on voluntariness, the jury would probably be confused about whether or not its finding regarding the voluntariness of his statement had to be unanimous.  We disagree.  Because there was no contrary instruction suggesting that any part of the jury's findings could be less than unanimous, and because we read individual jury instructions in the context of the complete set, *State v. Cunningham*, 2000-NMSC-009, ¶ 21, 128 N.M. 711, 998 P.2d 176, there is no basis to conclude that the jury would have been confused.  Consequently, the trial court reasonably concluded that Evans's proposed special interrogatory would be cumulative, and insofar as it duplicated already existing instructions, might confuse the jury.

18

**V.    CONCLUSION**

**{30}**    Because we do not find error in the proceedings below, there is no basis to find cumulative error.  *See State v. Salas*, 2010-NMSC-028, ¶ 40, 148 N.M. 313, 236 P.3d 32.  As a result, Evans's convictions are affirmed.

**{31}**    **IT IS SO ORDERED.**

_____
                                         **EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**